949 P.2d 1047

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Gilbert CARDUS, Jr., Defendant–Appellant.**

**No. 19260.**

Intermediate Court of Appeals of Hawai'i.

Dec. 19, 1997.

Certiorari Denied Jan. 26, 1998.

Reginald P. Minn, on the brief, Honolulu, for defendant-appellant.

Loren J. Thomas, Deputy Prosecuting Attorney, City & County of Honolulu, on the brief, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

We hold that the "consent" of an imprisoned person who, under the terms of Hawai'i Revised Statutes (HRS) § 707–731(1)(c) (1993) is subjected to sexual penetration by a person employed in a state correctional facility, is "ineffective consent" as defined in HRS § 702–235(3) (1993), and therefore not a defense to that charge of sexual assault in the second degree defined in HRS § 707–731(1)(c). We find support for our holding in the analogous section of the Model Penal Code and Commentaries (Official Draft and Revised Comments 1980) (MPC) and in construing HRS § 707–731(1)(c) *in para materia* with the other statutes relating to sexual assault.

We further hold that the words "subject to" in the phrase "subject to sexual penetration" in HRS § 707–731(1)(c) do not render that provision unconstitutionally vague. The first circuit court (the court) ruled in effect that consent is not a defense to a HRS § 707–731(1)(c) charge and that HRS § 707–731(1)(c) was not vague. Because we conclude the court was correct and we discern no reversible error in other points raised on appeal by Defendant–Appellant Gilbert Cardus, Jr. (Defendant), we affirm the August 29, 1995 judgment of his conviction and sentence for violating HRS § 707–731(1)(c).

I.

A.

The facts adduced at trial are not in dispute. Defendant was employed as an Adult Corrections Officer (ACO) at the O'ahu Community Correctional Center (OCCC), a state

correctional facility, at the time of the incident. Melanie Arneson (Arneson) was a pretrial detainee imprisoned at OCCC Module 11.[1] Defendant and Arneson became friends through their acquaintance with Anthony Bolos (Bolos). Bolos was Arneson's boyfriend. Bolos had also been an inmate at OCCC and knew Defendant as an ACO.

While Arneson was incarcerated, Bolos sent her a letter proposing marriage. Unbeknownst to Bolos, Arneson never received the letter. The OCCC administrative staff had retained the letter because it contained money, an apparent violation of prison rules. When no response was made to his proposal, Bolos sent a second letter to Arneson, terminating their relationship. Arneson received this letter.

Upset, Arneson spoke to Defendant about Bolos. Arneson testified Defendant asked "if there was any way he could help [her] contact [Bolos][.]" Arneson responded by requesting Defendant to "find how [sic] what's going on." Defendant called Bolos at a telephone number supplied by Arneson but was unsuccessful in persuading Bolos to speak to him.

Defendant subsequently went to Bolos's residence but received no response. Bolos indicated he heard someone knocking but did not answer. Defendant offered to return to Bolos's home the next day. As a result, Arneson prepared a letter for Bolos and asked Defendant to deliver it. Defendant delivered the letter by sliding it under Bolos's door.

On April 2, 1993, Defendant was assigned to work in Module 11. That day, Arneson was assigned to work in the Module 11 kitchen. Following lunch, and during "lockdown" of the prisoners, Arneson hid in a cubbyhole so she could remain in the kitchen and talk to Defendant.

With Defendant standing in front of her, Arneson proceeded to engage in fellatio with Defendant. At trial, Arneson testified that Defendant made a remark about her "giving

him oral sex." She further testified as follows:

> [Prosecutor]: *In what context, in what way did this thing about you giving him oral sex come up?*
>
> [Arneson]: *It was, like, for [Defendant] doing favors he did, like, what was he going to get in return, but then, in a way, I also began to look at [Defendant] in another way.* I did begin to like him, but I also felt obligated to him because of the favors that he did for me, because I know what he did, he could have lost his job.
>
> . . . .
>
> [Prosecutor]: How did you feel at that time when [Defendant] approached you knowing that you had talked about favors for favors in the past and you felt some attraction?
>
> [Defense counsel]: I object. That's not really leading but suggests the answer that he wants.
>
> The Court: Overruled.
>
> [Prosecutor]: Thank you.
>
> The Court: Answer the question.
>
> [Arneson]: Part of me felt obligated; yet part of me, I wanted to do it being incarcerated for about a month then, and prior to being incarcerated, I wasn't having sex with [Bolos]. So I guess you could say in a way I did want it.
>
> . . . .
>
> [Prosecutor]: *Did you also feel obligated?*
>
> [Arneson]: *Yes, I did.*

(Emphases added.)

During recross-examination, Arneson indicated she was a voluntary participant in the encounter:

> [Defense counsel]: Like you told us a couple times already, this was like something that just kind of happened; the desire was there to do it, and all the little things just sort of fell into place?
>
> [Arneson]: Yes.
>
> . . . .

1. Module 11 is the only female detention area at the Oʻahu Community Correctional Center (OCCC).

[Defense counsel]: It wasn't [Defendant] saying this is a perfect place; you were the one who said this is a perfect place and he said, yes, referring to how everything just sort of fit together, correct?

[Arneson]: Basically, yes.

Subsequently, Arneson informed her cellmate and another inmate about the occurrence, but instructed them not to say anything about it. A few days later, a Sergeant Sanders asked Arneson about the incident. Because she and her cellmates had agreed not to reveal what had happened and she sought to protect Defendant, Arneson denied the incident had taken place.

Two days later, however, Arneson approached Sergeant Sanders and admitted she had engaged in sexual conduct with Defendant. Arneson reported the incident because her "conscience got to [her]" and, because of her concern "that something could [otherwise] happen to" her fellow inmates.

Consequently, an investigation was initiated by the Honolulu Police Department (HPD). Detective Dennis Kim (Detective Kim) interviewed Defendant on April 22, 1993. After waiving his constitutional rights, Defendant claimed that he knew Arneson just in "passing." Defendant further denied that he was alone with Arneson on April 2, 1993, and that anything had happened between them.

Defendant did disclose, however, that he delivered Arneson's letter to Bolos's residence. He further conceded that "acceptance of any sexual advances from an inmate to an [ACO was] against prison policy" and that his delivery of the letter was also against prison policy. Defendant further acknowledged that sexual contact with Arneson "would be a felony."

On May 6, 1993, Defendant was interviewed by Detective Allan Castro (Detective Castro). Following the waiver of his rights, Defendant admitted to the sexual encounter between himself and Arneson. Defendant went on to say, however, that when he realized what was happening, he stepped back and told Arneson that they "[couldn't] do this." Defendant explained that he had not earlier disclosed what had transpired because of his concern for Arneson's emotional problems, and because he did not want to get into "any sort of trouble."

B.

Following the return of the grand jury indictment in this case,[2] Defendant filed a motion to dismiss the indictment on December 5, 1994. In this motion, Defendant contended that "(1) there was insufficient evidence presented to the grand jury to support the indictment, (2) the grand jury counsel provided inaccurate and misleading legal advice to the grand jury,[3] or (3) [HRS] § 707–731(1)(c) is unconstitutionally vague."

On March 2, 1995, the court filed its findings of fact (findings), conclusions of law (conclusions) and order denying Defendant's motion. The court found that the grand jury counsel read the "relevant and applicable sections and the Grand Jury properly determined that consensual sex was of no consequence to the charged offense," and concluded that there was "substantial and adequate evidence . . . to support the charged offense" and the statute was not unconstitutionally vague.

2. The September 1, 1994 indictment stated that: On or about the 2nd day of April, 1993, in the City and County of Honolulu, State of [Hawai'i], [Defendant–Appellant] GILBERT CARDUS, JR. [(Defendant)] while employed in a state correctional facility, to wit, [OCCC], did knowingly subject to sexual penetration an imprisoned person Melanie Arneson [(Arneson)], by inserting his penis into her mouth, thereby committing the offense of Sexual Assault in the Second Degree, in violation of Section 707–731(1)(c) of the [Hawai'i] Revised Statutes [(HRS)].

3. "The position of an independent grand jury counsel was created to . . . advis[e] the grand jury as to the law." *State v. Rodrigues*, 63 Haw. 412, 417, 629 P.2d 1111, 1115 (1981) (citation omitted).

Defendant argued in his memorandum in support of his motion to dismiss that the grand jury counsel misadvised the grand jury on the issue of consent by saying consent was "a defense [that] is only raised—it could be raised as a defense, say, *later on*" and "a person cannot consent to be violated, let's say, *of any crime*."

## C.

Defendant's jury trial commenced on May 10, 1995. During voir dire, prospective juror Lawrence Nagashima (Nagashima) stated he had prior experience as an alternate juror in a civil case, "[t]he whole judicial process takes a long time[,]" and "discerning the credibility of each individual that's testifying on this case ... would be a real difficult portion [sic][.]" Nagashima indicated, however, that "I will try my best." Defense counsel then examined Nagashima extensively about the effect a lengthy trial might have on his ability to serve as a juror:

> [Defense counsel]: There is nothing about that, though, that would cause you to take it out on [Defendant]?
>
> [The Juror]: There would be no reason to, but if I could address the judge.
>
> [Defense counsel]: You can't do that right now. I will blame Judge Nagata. How long was that trial you were in? Was it a lengthy trial? Did it go on for weeks?
>
> [The Juror]: It was very lengthy, but it was—it wasn't very complicated either. Maybe about four, five days.
>
> [Defense counsel]: You felt like it took up a lot of time for, I guess, relatively simple kinds of questions?
>
> [The Juror]: There was some complexities in it, yes, but it did take quite a long time.
>
> [Defense counsel]: It wasn't so much waiting around as the length of the in-court process or was it both?
>
> [The Juror]: Not waiting around but the length of the in-court process.
>
> [Defense counsel]: That won't be a distraction to you in this case if you felt the same thing happening, taking a long time to get this thing going or finished?
>
> [The Juror]: Of course, like, *I will try to put aside my feelings and do my best if I have to serve as a juror,* but yes.
>
> . . . .
>
> [Defense counsel]: What I am saying, would it bother you to the point where you think you couldn't really be a good juror in this case? It could happen?

> [The Juror]: *I think I would try to be as fair and impartial as I could be.* It would bother me, but *I will try to do the best I could* [sic].

(Emphases added.)

Despite Nagashima's assurances that he would "do [his] best," Defendant challenged Nagashima for cause. The court denied the motion, stating, "Natural process. [sic] Can [sic] be bothered by the proceedings but try to be fair and impartial." Defendant subsequently used his last peremptory challenge to excuse Nagashima.

The prospective juror selected to take Nagashima's place was Lori Uno (Uno). During the prosecutor's examination, Uno indicated that she would be working at nights during the trial but would "do [her] best" and believed she could "do the job":

> [Prosecutor]: Do you know how long you would be anticipating having to work at night? ... [A]s a juror, you really need to be attentive to what each of the witnesses have [sic] to say and [the] evidence that is being brought forth so that you can make an informed judgment in this case, right, so if ... because of your work schedule at night, you are going to be tired during the day, we need to know. Do you think that might be a problem?
>
> [The Juror]: *I will do my best here.* As I said, after I leave here, I will be going down to the office every night maybe till at least nine, ten o'clock; on weekends, also.
>
> . . . .
>
> [Prosecutor]: Do you think that you may be too tired to sit?
>
> [The Juror]: *I will do my best.*
>
> . . . .
>
> [Prosecutor]: Would you be thinking about what might be happening at your job while we're [sic] sitting as a juror in this case?
>
> [The Juror]: I think so, because right now ... still I want to be doing my job. As I mentioned yesterday, that the amount of billing I need to get out, money that they—we would lose otherwise.
>
> . . . .
>
> [Prosecutor]: How do you feel about [jury duty]?

[The Juror]: *I think I can do the job.* (Emphases added.)

After questioning by defense counsel and his approval of Uno as a prospective juror, the prosecutor challenged her for cause on the ground that Uno might not be "as attentive as we might want her to be." Defense counsel then joined the prosecutor in making the same challenge for cause. The court stated, "She said she's going to try. I am going to deny your motion."

### D.

Prior to opening statement, the court entertained Defendant's motion in limine, which sought, *inter alia*, to exclude Detective Kim from revealing certain of the statements Defendant had given to the police.[4] At that time, the State of Hawai'i (the State) made its offer of proof for Detective Kim's testimony. Then, the following discussion took place concerning Detective Kim's testimony:

[Defense counsel]: *[M]y concern is that there not be reference to [Defendant's] and/or [Detective Kim's] legal conclusion that sexual contact of any nature between a guard and an inmate was a violation of the penal code.* And based on what [the State] had just stated to the Court, my understanding is that we're not going to get into [that] area[ ].

The Court: [Mr. Prosecutor], based on your offer of proof, if you could insure that Detective Kim limits himself to the offer of proof and not get into areas [defense counsel] had discussed, I believe [defense counsel] will be withdrawing his objection.

. . . .

[Defense counsel]: [I]n the statement, actually, I think [Defendant] does go one step beyond [stating that he was wrong]. I think Detective Kim does as well, perhaps. They're talking in terms of the law, law of sexual assault, basically.

[Prosecution]: *We're not going to get into that.*

. . . .

The Court: [Mr. Prosecutor], you will talk to [Detective Kim], explicitly tell him not to get involved in the comments . . . about penal code or statute. . . .

[Defense counsel]: With that understanding, I think rather than withdrawing the motion, I am assuming [the State] is stipulating that with respect to these, to the nature of the items I discussed, his witness is not going to go into those areas.

The Court: I believe that's the stipulation.

[Prosecutor]: Yes. No problem, Your Honor.

(Emphases added.)

However, during cross-examination, Detective Kim violated the stipulation:

[Defense counsel]: And in the context of you asking him about what the prison policy was he was telling you, was he not, that, well, if you take the letter out that's a violation of prison policy but it's a less serious type of violation than the sexual contact, correct?

[Detective Kim]: That's correct.

[Defense counsel]: And that the violation for taking the letter out might result in some type of short suspension or small discipline but sexual contact could result in his losing his job that he had for many years, correct?

[Detective Kim]: *He said the, in reference to the sexual contact he did mention it would be a felony.*

(Emphasis added.)

At that point, a bench conference was held. Defendant moved for a mistrial based on "a violation of what the court ordered." Following extensive argument outside the presence of the jury, the court denied Defendant's motion for mistrial, but ruled that it would instruct the jury that

as far as the law involved in this case as to the offense charged, it is, the court will instruct you as to the law, and the court

---

4. Defendant's motion in limine sought, in part, to exclude Defendant's initial statement to Detective Dennis Kim (Detective Kim) where he denied any sexual contact with Arneson, and that portion of Defendant's subsequent statement to Detective Allen Castro where he admitted that "he was wrong" in having sexual contact with Arneson. The written motion did not refer to Defendant's statement to Detective Kim acknowledging that the instant offense was a felony.

and only the court would determine what the law in this particular case is. It's not up to any individual to establish what the law is in this particular case.

Defense counsel requested the court to "instruct the jury to disregard the detective's answers to the questions that [defense counsel] asked on cross-examination and ask it to be stricken." Apparently agreeing, the court instructed the jurors as follows: "Ladies and gentlemen: Before the break a statement was made by Detective Kim. At this time I am going to ask that you disregard the last statement that was made by Detective Kim. Please disregard the last statement that was made by Mr., Detective Kim before the break."

A subsequent bench conference ensued in which defense counsel informed the court that the instruction was not sufficient. The court then issued a further instruction as follows: "Ladies and gentlemen: Point of clarification. The court at this time will instruct you to please disregard all of the questions asked by defense counsel during cross-examination and all answers given by Detective Kim during that cross-examination."

### E.

During the State's rebuttal argument, the prosecutor urged the jury to, in effect, ignore the jury instructions and follow their "common sense." The prosecutor stated, in relevant part:

Deep down inside, you are thinking, this guy is guilty. But somewhere along the line you are going to start, *you think you are getting mixed up with all this legal jargon and stuff. And then you find him not guilty.*

Well, *just remember then deep down inside that is your common sense talking to you and that is what should stick out more so that [sic] feeling you are getting confused with what these instructions* or what the attorneys are arguing. Use your common sense. Deep down inside if you feel this person is guilty, he is guilty.

That's common sense. And I would submit that that is the case here.

(Emphases added.)

Defense counsel immediately objected and another bench conference followed. Defense counsel moved for a mistrial and the court denied the motion as follows:

The Court: Motion for mistrial. I will deny the motion. However, [Mr. Prosecutor], that is an incorrect statement of the law. What you are trying is [sic] find the defendant guilty but at the same time the statement of law is incorrect. Common sense. That is not a correct statement of law. I will strike the statement. I will instruct the jury.

The court then proceeded to instruct the jury by stating, "Ladies and gentlemen, at this time I am going to ask you to please disregard the prosecutor's last statement. And ask you to please disregard the prosecutor [sic] last statement."

### II.

Defendant contends that the court erred in (1) denying his pre-trial motion to dismiss the indictment on the grounds of (a) grand jury errors and (b) the unconstitutional vagueness of HRS § 707–731(1)(c); (2) refusing to excuse venire persons Nagashima and Uno for cause; and (3) denying his motion for a mistrial premised on (a) Detective Kim's testimony that Defendant referred to the instant offense as a "felony" and (b) the prosecutor's argument that the jurors' "common sense" should prevail over the court's instructions.

### III.

### A.

In connection with his motion to dismiss the indictment, Defendant challenges the court's finding No. 5 which stated, "The Grand Jury asked Grand Jury Counsel whether consent negated the offense charged. Counsel read the relevant and applicable sections [HRS §§ 702–233 and 702–235] and the Grand Jury properly determined that consensual sex was of no conse-

quence to the charged offense."[5] Defendant argues that consent is a defense to his charge and consequently the grand jury counsel provided prejudicial and misleading advice[6] regarding the defense.

### 1.

HRS 707–731 provides, in pertinent part: "(1) A person commits the offense of sexual assault in the second degree if: . . . (c) The person, while employed in a state correctional facility, knowingly *subjects to* sexual penetration an imprisoned person. . . ." (Emphasis added.)

Generally, consent to conduct prohibited under our penal code is a defense.[7] HRS § 702–233 (1993) states, "In any prosecution, the victim's consent to the conduct alleged, or to the result thereof, is a defense if the consent negatives an element of the offense or precludes the infliction of the harm or evil sought to be prevented by the law defining the offense."

Thus, consent to sexual intercourse is a defense to a charge of "rape." Commentary to HRS § 702–233.[8] However, "[i]t is obvious [the defense of consent] should not be extended to all types of evils or harms and therefore [HRS § 702–233] is intended to be read in conjunction with [HRS] § 702–234 (consent to bodily injury) and *[HRS] § 702–235 (ineffective consent)." Id.* (emphasis added).

HRS § 702–235 (1993) is pertinent to the instant case and renders consent ineffective in four instances. In the situations described, "the victim's apparent consent is actually meaningless." Commentary to HRS § 702–235. HRS § 702–235 states as follows:

Unless otherwise provided by this Code or by the law defining the offense, *consent does not constitute a defense if:*

(1) It is given by a person who is legally incompetent to authorize the conduct alleged; or

(2) It is given by a person who by youth, mental disease, disorder, or defect, or intoxication is manifestly unable or known by the defendant to be unable to make a reasonable judgment as to the nature or harmfulness of the conduct alleged; or

(3) *It is given by a person whose improvident consent is sought to be prevented by the law defining the offense;* or

(4) It is induced by force, duress, or deception.

(Emphases added).

While there is no legislative history concerning HRS § 707–731(1)(c) and no explanation of its purpose in the commentary to that section, we conclude that an imprisoned person's consent to "sexual penetration"[9] by an employee of a state correctional facility is ineffective, *see* HRS § 702–235, and thus is not a defense to a charge brought pursuant to HRS § 707–731(1)(c). In our view an imprisoned person's consent is deemed "improvident" and hence "prevented by" HRS § 707–731(1)(c). We find support for this view in the MPC and in the framework of the sexual assault statutes, HRS §§ 707–730 to 707–733 (1993).

### 2.

The Hawai'i Penal Code is based on the MPC. Sen. Stand. Comm. Rep. No. 599, in

---

5. Insofar as the last sentence in finding of fact No. 5 states the grand jury "properly determined" that consent was of "no consequence," it rested on an interpretation of HRS § 707–731(1)(c) (1993) and therefore was a conclusion of law.

6. *See supra* note 3.

7. HRS § 701–115(1) (1993) provides that "[a] defense is a fact or set of facts which negatives penal liability."

8. We may use the commentary accompanying the Hawai'i Penal Code "as an aid in under-

standing the provisions of the Code[.]" HRS § 701–105 (1993).

9. "Sexual penetration" is defined as

vaginal intercourse, anal intercourse, *fellatio,* cunnilingus, anilingus, deviate sexual intercourse, or any intrusion of any part of a person's body or of any object into the genital or anal opening of another person's body; it occurs upon any penetration, however slight, emission is not required. For purposes of this chapter, each act of sexual penetration shall constitute a separate offense.

HRS § 707–700 (1993) (emphasis added).

1971 Senate Journal, at 1067 ("the [MPC] ... has been used by the Judicial Council of [Hawai'i] as the guide for the [Hawai'i] Penal Code"); *see also* Hse. Stand. Comm. Rep. No. 227, in 1971 House Journal, at 784. MPC § 213.3, Corruption of Minors and Seduction, is similar to HRS § 707–731(1)(c). It states, in relevant part: "(1) *Offense Defined.* A male who has sexual intercourse with a female not his wife ... is guilty of an offense if: ... (c) *the other person is in custody of law* or detained in a hospital or other institution *and the actor has supervisory or disciplinary authority over him* [.]" MPC § 213.3, at 376 (first emphasis in original). The scope of this subsection encompasses "consensual behavior that merit[s] criminal punishment." *Id.* comment at 377. It is specifically aimed at "[sexual] intercourse by an actor who has disciplinary or supervisory authority over a person who is detained in institutional custody," *Id.*, and thus covers within its ambit a prisoner and a person having authority over the prisoner. The MPC acknowledges that "institutionalized women [10] may act voluntarily and competently in seeking sexual relations with ... custodial personnel" but that "prevention of such relationships may be a proper objective of the penal law." [11] *Id.* comment at 389–90.

The objective of HRS § 707–731(1)(c) is essentially the prevention of sexual relations between the designated persons, as evident from its prohibition against sexual penetration between "an imprisoned person" and a person "employed in a state correctional facility." This objective falls squarely within the ineffective consent provision of HRS § 702–235(3) which "covers those cases where the law 'deliberately ignores the actual attitude on the part of the "victim" in order to protect members of the class of which he or she is a member.'" Commentary to HRS

§ 702–235 (quoting Prop. Mich. Rev. Cr.Code § 330, comments at 41 (1967)). From the foregoing we conclude the intent of the statute was to prevent sexual penetration of an imprisoned person, even if agreed to by that person. The consent of an imprisoned person would therefore be ineffective and, consequently, not a defense under HRS § 707–731(1)(c) to the charge of sexual penetration.

### 3.

We find additional support for this conclusion in construing HRS § 707–731(1)(c) with reference to the other sexual assault statutes.

In 1986, the legislature "incorporated all of the sexual offenses into five degrees of sexual assault." Commentary to HRS §§ 707–730 to 707–734; *see State v. Buch*, 83 Hawai'i 308, 315, 926 P.2d 599, 606 (1996) (explaining that in 1986 "the Legislature ... incorporated all of the sexual offenses into five degrees of sexual assault" (citing 1986 Haw. Sess. L. Act 314, § 57, at 617–18; Conf. Comm. Rep. No. 51–86, in 1986 House Journal, at 937, 938)). These five degrees, sexual assault in the first through fifth degrees, "comprise[d] a graduated series of offenses from a class A felony to a petty misdemeanor, providing punishment reflecting the seriousness of the offense committed." MPC § 213.3 comment at 377. Because the offense of sexual assault in the second degree was included in this "series of offenses," it may be construed with reference to the other three sexual assault statutes. [12] HRS § 1–16 (1993) provides, in pertinent part, that "[l]aws in pari materia, or upon the same subject matter, shall be construed with reference to each other." *See State v. Arceo*, 84 Hawai'i 1, 19, 928 P.2d 843, 861 (1996).

The conduct elements [13] largely common to the sexual assault statutes, HRS §§ 707–

---

**10.** The application of HRS § 707–731(1)(c) does not depend upon the gender of the imprisoned person.

**11.** The Model Penal Code and Commentaries (Official Draft and Revised Comments 1980) (MPC), however, departs from the HRS in finding "the very severe penalties authorized for forcible rape" inappropriate for such "abuse of custodial authority" and punishes such abuse as a misdemeanor. MPC § 213.3 comment at 390.

**12.** In 1991, sexual assault in the fifth degree was retitled "indecent exposure." Commentary to HRS §§ 707–730 to 707–734 (1993).

**13.** "Conduct" is an element of offenses defined under our penal code. HRS § 702–205 (1993) states: "The elements of an offense are such (1) *conduct*, (2) attendant circumstances, and (3) results of conduct, as: (a) Are specified by the definition of the offense, and (b) Negative a defense (other than a defense based on the statute

730 to 707–733, are either (1) knowingly or recklessly subjecting another person to prohibited sexual acts or (2) doing so by "compulsion" or "strong compulsion." "Compulsion" [14] and "strong compulsion" [15] denote lack of consent or acts intended to overcome resistance to prohibited sexual conduct. Thus, for those provisions of HRS §§ 707–730 to 707–733 where "compulsion" or "strong compulsion" is an element of the offense, "consent [of the complainant or 'victim'] to the conduct alleged" negatives the elements of "compulsion" or "strong compulsion" and hence is an effective defense to the sexual assault charge involved. *See* HRS § 702–233.

In those provisions of HRS §§ 707–730 to 707–733 where compulsion or strong compulsion is not an element of the offense, as in HRS § 707–731(1)(c), the prosecution obviously need not prove compulsion or strong compulsion. In these situations, then, the lack of consent or the presence of acts intended to overcome resistance are neither relevant nor material to the harm sought to be prohibited by the statute. As indicated previously, such offenses quintessentially exemplify situations "where the law 'deliberately ignores the actual attitude ... of the "victim" in order to protect members of the [victim's] class....' " *See* Commentary to HRS § 702–235 (quoting Prop. Mich. Rev. Cr.Code § 330, comments at 41 (1967)).

It is understandable, then, that the ineffective consent provisions of HRS § 702–235 appropriately correspond with those provisions in HRS §§ 707–730 to 707–733 where the conduct element required to be proved is that the defendant "subjects" the protected person to prohibited sexual acts, without any reference to compulsion or strong compulsion on the part of the defendant. For example,

HRS § 702–235(2) provides that "[u]nless otherwise provided ..., consent does not constitute a defense if ... given by a person ... of youth, mental disease, disorder, or defect[.]" In a parallel manner, compulsion or strong compulsion are not elements of the sexual penetration of a "person who is less than fourteen years old" under HRS § 707–731(1)(b), or a "person who is mentally defective, mentally incapacitated, or physically helpless" under HRS § 707–731(1)(b) and HRS § 707–732(1)(c). We conclude, then, that as in the case of persons "less than fourteen years old" or "mentally defective, mentally incapacitated, or physically helpless," "an imprisoned person['s]" consent is ineffective and, as a result, not a defense to a charge under HRS § 707–731(1)(c). *See In re Doe*, 81 Hawai'i 447, 454 n. 2, 918 P.2d 254, 261 n. 2 (App.1996) (holding consent ineffective as to complaining witness who is mentally defective, mentally incapacitated or physically helpless).

### 4.

Because consent is not a defense to the instant offense, finding No. 5 is not "clearly erroneous" [16] and the grand jury counsel's "advice" to the grand jury was not prejudicial and misleading.

### B.

Defendant also challenges conclusions Nos. 1 and 2. Conclusion No. 1 stated:

[HRS § 707–731(1)(c) ], under which Defendant stands charged, is not [un]constitutionally vague and in fact states with reasonable clarity the act it proscribes and provides fixed standards for adjudging guilt. *State v. Kameenui*, 69 Haw. 620,

---

of limitations, lack of venue, or lack of jurisdiction)." (Emphasis added.)

**14.** HRS § 707–700 states, in pertinent part, that " '[c]ompulsion' means absence of consent, or a threat, express or implied, that places a person in fear of public humiliation, property damage, or financial loss."

**15.** HRS § 707–700 defines "strong compulsion" as follows:

"Strong compulsion" means the use of or attempt to use one or more of the following to overcome a person:
(1) A threat, express or implied, that places a person in fear of bodily injury to the individual or another person, or in fear that the person or another person will be kidnapped;
(2) A dangerous instrument; or
(3) Physical force.

**16.** *See supra* note 5 (reference to "properly determined").

622, 753 P.2d 1250 (1988). Accordingly, the Grand Jury correctly reached its conclusion after being properly informed of the applicable statute.

Conclusion No. 2 stated: "Substantial and adequate evidence was presented to the Grand Jury to support the charged offense. It was established that the Defendant was and [sic] [ACO] at the [OCCC] and that during such employment engaged in sexual activity with an inmate at that same facility."

■ "A court's conclusions of law are reviewed under the right/wrong standard. Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Tangalin*, 79 Hawai'i 92, 95, 898 P.2d 604, 607 (App.1995) (citations and internal quotation marks omitted).

### 1.

■ We conclude that HRS § 707–731(1)(c) is not unconstitutionally vague.

[A] criminal statute is void for vagueness unless: it 1) gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited so that he or she may act accordingly; and 2) provides explicit standards for those who apply the statute, in order to avoid arbitrary and discriminatory enforcement and the delegation of basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis.

*State v. Gaylord*, ·78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995) (citations, quotations marks, and brackets omitted).

We believe a reading of the statute as a whole gives a "person of ordinary intelligence a reasonable opportunity to know what is prohibited" and provides explicit standards for those who apply it to avoid arbitrary and discriminatory enforcement. HRS § 707–731(1)(c) clearly states that if a person, while employed in a state correctional facility, knowingly subjects an imprisoned person to sexual penetration, he or she commits the

offense of sexual assault in the second degree.

■ Defendant maintains "subject to" is ambiguous and connotes the use of force incompatible with Arneson's voluntary participation in the act of sexual penetration.[17] The meaning of the phrase "subject to," however, includes "to expose to something: [i.e.:] subject to infection; to cause to experience something;" *American Heritage College Dictionary* 1352 (3d ed.1993), and "to lay open or expose to the incidence, occurrence, or infliction of, render liable to, something[;] to lay open, expose (physically)[,]" *Oxford English Dictionary* Vol. XVII 31 (2d ed.1989). A person, then, who knowingly causes an imprisoned person to experience sexual penetration or knowingly exposes that person to such an experience would be guilty of the offense. The phrase "subject to sexual penetration," thus, is sufficiently definite to afford a person "reasonable opportunity" to ascertain "what is prohibited." Accordingly, there being evidence, if believed, that Defendant knowingly exposed Arneson, an imprisoned person, to fellatio, Defendant, a person employed in a state correctional facility, came within the ambit of the statute.

### 2.

Because we determine that HRS § 707–731(1)(c) is not unconstitutionally vague, we conclude that conclusion No. 1 was right. Additionally, because contrary to Defendant's position the presence of consent was not relevant to the instant charge, the evidence adduced during the grand jury hearing was sufficient to support the indictment. Conclusion No. 2 was, hence, also correct.

### IV.

Defendant argues that the court erred by refusing to excuse venire persons Nagashima and Uno for cause. Because the court failed to excuse Nagashima for cause, Defendant asserts he was compelled to exercise his last peremptory challenge. Since Defendant had exhausted his peremptory challenges, Defen-

---

17. Arguably, Arneson's participation in the act of fellatio was not "consensual" but, as she explained, the satisfaction of an "obligation" she owed Defendant for his "favors." Our analysis, however, does not rest on this view.

dant was unable to remove Uno, Nagashima's replacement, when the court refused to excuse Uno for cause.

 "[T]he paramount question in determining whether to excuse for cause a prospective juror is whether the defendant would be afforded a fair and impartial trial based on the law and evidence, with the prospective juror as a member of the jury." *State v. Baron*, 80 Hawai'i 107, 114, 905 P.2d 613, 620 (1995) (citing *Territory v. Johnson*, 16 Haw. 743, 754 (1905); *McKeague v. Talbert*, 3 Haw.App. 646, 656, 658 P.2d 898, 906 (1983)). Such a decision "must be left to the sound discretion of the trial judge who is in a better position than the appellate court to ascertain from the answers of the juror whether the juror is able to be fair and impartial." *Id.* " 'An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party-litigant.' " *State v. Loa*, 83 Hawai'i 335, 349, 926 P.2d 1258, 1272, *reconsideration denied*, 83 Hawai'i 545, 928 P.2d 39 (1996) (quoting *State v. Jackson*, 81 Hawai'i 39, 47, 912 P.2d 71, 79 (1996) (citation and internal quotation marks omitted)).

 In the present case, we cannot conclude that the court abused its discretion in denying Defendant's request to remove Nagashima for cause.[18] On numerous occasions, Nagashima indicated that he would "do his best" and "try to be as fair and impartial as [he] could be." When Nagashima was selected, he replied in the affirmative when asked whether he could "be fair and impartial to the defense and to the State."

 While the court could have properly excused Uno, we also cannot conclude that the court abused its discretion in refusing to excuse her for cause. Defendant maintains that because of Uno's night work, she would not be a well-rested and, therefore, attentive juror. But like Nagashima, Uno offered to "do [her] best" and believed she could "do the job."

From the responses of these venire persons, we cannot conclude that the court abused its discretion in denying Defendant's motions to excuse for cause. Accordingly, Defendant was not denied "a fair and impartial trial ... with [Uno] as a member of the jury."

## V.

Defendant argues that the court erred by denying his motions for a mistrial following Detective Kim's improper testimony about Defendant's "felony" statement and following the prosecutor's improper "common sense" rebuttal argument.

 "As a general rule, it is for the circuit court to determine whether a ... cautionary instruction or ... a mistrial" is warranted. *State v. Kahinu*, 53 Haw. 536, 549–50, 498 P.2d 635, 644 (1972), *cert. denied*, *Kahinu v. Hawai'i*, 409 U.S. 1126, 93 S.Ct. 944, 35 L.Ed.2d 258 (1973). The denial of a motion for mistrial is reviewed under an abuse of discretion standard. *Loa*, 83 Hawai'i at 349, 926 P.2d at 1272 (citations omitted).

## A.

 Although in violation of the court's order, Detective Kim's testimony that Defendant referred to the instant offense as a "felony" did not require the court to declare a mistrial.

 Here, the court immediately issued a curative instruction to the jury following Defendant's motion for a mistrial due to the witness's improper statement. It is presumed that the jury follows the court's instructions. *State v. Samuel*, 74 Haw. 141, 149 n. 2, 838 P.2d 1374, 1378 n. 2 (1992) (citing *State v. Amorin*, 58 Haw. 623, 629, 574 P.2d 895, 899 (1978)). Therefore, we believe the potential prejudicial effect this statement would have had on the jury was eliminated by the judge's instruction. Moreover, the mere fact that Defendant was aware that sexual contact with an inmate was a felony had no bearing on whether or not he

---

18. HRS § 612–7 (1993) states, "A juror shall not be excused by a court for slight or trivial cause, but only when it appears that jury duty would entail a serious personal hardship, or that for other good cause the juror should be excused either temporarily or otherwise."

was guilty of the instant offense, nor does such a fact appear adversely prejudicial to Defendant in light of the evidence presented at trial. Therefore, we conclude that the court did not abuse its discretion in denying Defendant's motion for a mistrial.

### B.

Defendant argues that the prosecutor's "common sense" rebuttal argument constituted prosecutorial misconduct. We agree that the argument was improper. However, " '[p]rosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to defendant's right to a fair trial.' " *State v. Sanchez*, 82 Hawai'i 517, 528, 923 P.2d 934, 945 (App.) (quoting *State v. McGriff*, 76 Hawai'i 148, 158, 871 P.2d 782 (1994)), *cert. denied*, 84 Hawai'i 127, 930 P.2d 1015 (1996).

Here, Defendant immediately objected and the court promptly issued a curative instruction. As stated, a jury is presumed to follow the court's instructions. *Amorin*, 58 Haw. at 629, 574 P.2d at 899. In light of the immediate curative instruction and the evidence adduced at trial, we conclude that Defendant was not deprived of a fair trial.

### VI.

Accordingly, we affirm the August 29, 1995 judgment of Defendant's conviction and sentence.