**STATE OF HAWAII**, Plaintiff–Appellee, v. **DONALD GRAHAM**, Defendant–Appellant

NO. 12679

(CR. NO. 87–0525)

SEPTEMBER 19, 1989

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

628

OPINION OF THE COURT BY NAKAMURA, J.

Following a jury trial in the Circuit Court of the First Circuit, Donald Graham was adjudged guilty of three counts of Promoting a Dangerous Drug in the Second Degree. The convictions, he urges on appeal, must be vacated because the trial court erred when it: (1) did not excuse jurors he purportedly challenged for cause, (2) denied his motion to continue the trial, (3) denied his motion to exclude as evidence recordings of his conversations with an undercover agent of the police, (4) denied his motion to exclude evidence seized under a defective warrant, (5) permitted the jury to hear testimony that the undercover agent responsible for his apprehension had been involved in other drug transactions as an agent of the police, and (6) denied his motion for mistrial predicated on the deliberate injec-. tion of prejudicial evidence by a witness. Concluding from a review of the record that no reversible error was committed, we affirm the convictions.

I.

A.

The State Department of Human Services, the agency responsible for the administration of the Child Protective Act, Hawaii Revised Statutes (HRS) chapter 587, received a report on March 3, 1987 that the defendant's eight–year–old daughter was threatened by imminent harm because of his involvement in drug trafficking. A social worker assigned to the department's child protective services section began an investigation of the situation by going to the school where the child was enrolled as a pupil to interview her. The social worker neither sought the defendant's permission to speak with his daughter nor informed him of the report of his criminal activities.

In the course of the interview the child recounted some of the activities she observed in the apartment where she lived with her father. These activities included the weighing of cocaine and the exchange of cocaine for money by the defendant. The child said her father's girlfriend smoked cocaine in her presence, using a glass pipe, alcohol, cotton balls, and a lighter in the process. She also told the social worker about the large amounts of currency kept in the apartment. Believing she would be

harmed by the criminal activities of her father if she remained in the apartment, the agency assumed protective custody of the child on March 5, 1987.

The social worker passed on what she had learned to Detective Helepololei of the Honolulu Police Department. The detective then interviewed the child, who reiterated what was said earlier to the social worker. Helepololei conferred with Detective Godsey thereafter and asked him to secure a warrant authorizing a search of the apartment. Godsey prepared an affidavit setting forth the information given by the child to the other detective. But Godsey's affidavit contained a piece of erroneous information—it stated the child saw both her father and his girlfriend use cocaine. A warrant was issued on the strength of Godsey's affidavit, and the apartment was searched on March 6, 1987. The search yielded a triple–beam scale, the defendant's address book, a telephone bill with his name on it, and some small plastic bags. No cocaine was found in the apartment.

The Prosecuting Attorney filed a four–count criminal complaint against the defendant on May 12, 1987. Counts I, II, and IV thereof charged him with Promoting a Dangerous Drug in the Second Degree and Count III charged him with Promoting a Dangerous Drug in the First Degree. The defendant was arrested thereafter, and the arrest was the subject of extensive media coverage. A few days later there was a murder, which the defendant witnessed, outside his apartment. The media accounts of the murder named him as the same person whose daughter was in protective custody because of his involvement in the promotion of dangerous drugs.

## B.

The defendant's trial on the four charges of Promoting Dangerous Drugs commenced on October 6, 1987. The voir dire examination of prospective jurors revealed a number of them remembered the media accounts of the defendant's earlier tribulations. Twenty–four of the forty–one prospective jurors acknowledged they had been exposed to pretrial publicity adverse to the defendant. Of the twelve who were first seated in the jury box, six remembered media accounts of the defendant's arrest and the assumption of protective custody of his daughter by the State. One of the six said she could not be fair to the defendant, and she was excused and

replaced by another person who had some knowledge of the case. Several others were also excused when they said they could not be fair to the defendant.

The defendant exercised all of his allotted peremptory challenges to excuse prospective jurors who remembered the earlier media accounts of the defendant's troubles. Two of the three peremptory challenges, however, were exercised without prior challenges for cause. The jury that heard the State's case against the defendant included six of the twenty–four prospective jurors who indicated they had viewed or read accounts in the print or electronic media of the defendant's arrest and the State's assumption of protective custody of the child.

Before evidence was adduced, however, the defendant unsuccessfully sought "a postponement of the trial to a later date so that a new jury could be picked with more time standing between the trial and the pretrial publicity." He then moved to suppress as evidence tape recordings of telephone conversations between himself and an undercover police agent. The trial court heard the motion over the State's objection that it was untimely and denied it. The defendant also moved unsuccessfully to suppress as evidence items seized in the search conducted of the defendant's apartment.

The State called as witnesses its undercover agent, the police officer who "supervised" the agent, the officers who conducted the search of the defendant's apartment, and a police criminalist who identified the substance the agent received from the defendant as cocaine. The defendant did not testify at trial; nor did he call any witnesses to rebut the evidence adduced by the State.

At the close of evidence the defendant moved for and was granted a judgment of acquittal on the charge of Promoting a Dangerous Drug in the First Degree. The remaining charges were submitted to the jury for decision, and it returned guilty verdicts on all three counts of Promoting a Dangerous Drug in the Second Degree. The trial court's judgment of convictions was entered thereafter, and the defendant perfected a timely appeal to this court.

II.

Our scrutiny of the six points of alleged error begins with the claim that the trial court's failure to excuse three jurors who "simply could not

make up their minds if they could be fair or not" caused the defendant "to waste all three of his peremptory challenges" and "severely affected" his right to a fair trial.

A.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial . . . jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). And "[t]he theory of the law is that a juror who has formed an opinion cannot be impartial." *Reynolds v. United States*, 98 U.S. 145, 155 (1878). The law, however, does not require a juror to "be totally ignorant of the facts and issues involved" when he is sworn. *Irvin v. Dowd, supra.*

A criminal case of this nature undoubtedly will command media attention and "arouse the interest of the public in the vicinity[.]" 366 U.S. at 722. "[S]carcely any of those . . . qualified to serve as jurors [would] not have formed some impression or opinion as to the merits of the case." *Id.* A ruling "that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would . . . establish an impossible standard." *Irvin v. Dowd*, 366 U.S. at 723. The prevailing rule thus allows a person with preconceived notions about a case to serve as a juror if he "can lay aside his impression or opinion and render a verdict based on the evidence presented in court. *Spies v. Illinois*, 123 U.S. 131 [(1887)]; *Holt v. United States*, 218 U.S. 245 [(1910)]; *Reynolds v. United States, supra.*" 366 U.S. at 723.[1]

When a juror is challenged on grounds that he has formed an opinion and cannot be impartial, the test is "whether the nature and strength of the opinion . . . are such as in law necessarily . . . raise the presumption of partiality." *Reynolds v. United States*, 98 U.S. at 156. The question "is

---

[1] This was written into our law as early as 1807 when "Mr. Chief Justice Marshall, in *Burr's Trial* (1 Burr's Trial, 416), state[d] the rule [was] that 'light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him.'" *Reynolds v. United States*, 98 U.S. at 155.

one of mixed law and fact," *id.*, and "[t]he affirmative of the issue is upon the challenger." 98 U.S. at 157. Furthermore, the reviewing court is bound by "the proposition that findings of impartiality should be set aside only where prejudice is 'manifest.' *Holt v. United States, supra; Spies v. Illinois, supra; Hopt v. Utah*, 120 U.S. 430 [(1897)]." *Irvin v. Dowd*, 366 U.S. at 724; *cf. Territory v. Johnson*, 16 Haw. 743, 754 (1905) (In determining whether a juror can be fair, "much must be left to the sound discretion of the trial judge.").

B.

The State maintains and the record confirms the defendant challenged the impartiality of only one of the three prospective jurors on whom he claims peremptory challenges were wasted. "A defendant in a criminal case cannot sit in silence and accept a juror as unprejudiced and fair and then subsequently allege error in the retention of the same juror." *Territory v. Fukunaga*, 30 Haw. 697, 704, *appeal dismissed*, 33 F.2d 396 (9th Cir.), *cert. denied*, 280 U.S. 593 (1929); *see also McKeague v. Talbert*, 3 Haw. App. 646, 655, 658 P.2d 898, 906 (1983).

The result can be no different where a member of the jury panel is not challenged for cause and is later excused on a peremptory challenge. No error can be predicated on the trial court's failure to excuse the proposed juror for cause since "the court was not asked to rule on the matter and did not rule." *Territory v. Fukunaga*, 30 Haw. at 704. Our discussion here is thus confined to the prospective juror whose impartiality was challenged.

As the defendant avers, the record reflects the ambiguous and at times contradictory responses of the challenged juror to queries regarding her willingness to lay aside impressions or opinions formed from earlier media accounts. Still, "[t]his is not unusual on *voir dire* examination, particularly in a highly publicized criminal case." *Patton v. Yount*, 467 U.S. 1025, 1039 (1984).[2] Her opinions could hardly be characterized as

---

[2] The Supreme Court went on to say:

> It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected

"strong and deep impressions which close the mind against the testimony that may be offered in opposition to them." *See supra* note 1. The following colloquy between the court and the prospective juror dispels the suggestion that she could not render a verdict based on the evidence:

THE COURT: Have you formed some kind of an opinion as to what type of a person perhaps Mr. Graham might be?

PROSPECTIVE JUROR: No, not really.

THE COURT: Are you willing to put aside whatever you do know and be guided by what is offered in evidence at this trial in order to pass judgment upon Mr. Graham?

PROSPECTIVE JUROR: I would try. I really don't know if I can positively say yeah, yes.

THE COURT: All right. Do you have some serious doubts about whether you will be able to be fair?

PROSPECTIVE JUROR: I really don't know. I really —it's hard for me to say yes to that. I have serious doubts. I don't know.

THE COURT: Okay. Would you be able to follow the Court's instructions at the end of the trial? Are you pretty good about following instructions?

PROSPECTIVE JUROR: Yes.

THE COURT: Now, whatever your opinions of the law may be, in the end I will be prescribing what law you are to apply. And do you think you'd be able to follow the instructions as I give them to you on what the law is?

PROSPECTIVE JUROR: Yes, I think so.

THE COURT: Basically, do you think that you can be fair to Mr. Graham?

PROSPECTIVE JUROR: I would try. I think I could try.

---

invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading.

*Patton v. Yount*, 467 U.S. at 1039.

We would have to say the defendant failed to meet his affirmative burden of raising a presumption of partiality. [3]

### III.

Having found no error in the trial court's refusal to excuse the challenged juror for cause, we proceed to the related claim of error in the court's denial of the defendant's motion for continuance of trial.

### A.

Ordinarily, "[t]he granting of a continuance is within the discretion of the trial judge and is not reviewable except for abuse of that discretion. *The Queen v. Ah Kiao*, 8 Haw. 466; *Territory v. Van Dalden*, 33 Haw. 113; *see also* Annotation, 39 A.L.R.2d 1321–1324." *State v. Gager*, 45 Haw. 478, 488, 370 P.2d 739, 745 (1962). But we are not dealing with a garden–variety motion for continuance of trial; for what was sought of the trial court was a postponement necessitated by "the strong possibility that the jury would be prejudiced by pretrial publicity." In other words, the defendant asserted his right to a fair trial was imperiled by adverse publicity and the trial should be put off until the passage of time dissipated the high potential for prejudice. As we observed earlier, "[t]he constitutional standard of fairness [applicable to a jury trial] requires that a defendant have 'a panel of impartial . . . jurors.' *Irvin v. Dowd*, 366 U.S., at 722." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). If pretrial publicity rendered the impanelment of such persons unlikely, a continuance was hardly a matter of discretion.

Yet, "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977). Nor does "juror exposure to information about a . . . defendant's prior convictions or to news accounts of the crime with which he is charged alone presump-

---

[3] Moreover, the challenged juror did not sit in judgment of the defendant. "So long as the jury that [sat was] impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, ____, 108 S. Ct. 2273, 2278, *reh'g denied*, ____ U.S. ____, 109 S. Ct. 11 (1988).

tively deprive[] the defendant of due process." *Murphy v. Florida*, 421 U.S. at 799. "In those cases [where] the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings[,]" however, unfairness can be presumed. *Id.*

The Supreme Court thus presumed "the circumstances under which the trials in *Rideau* [*v. Louisiana*, 373 U.S. 723 (1963)], *Estes* [*v. Texas*, 381 U.S. 532 (1965)], and *Sheppard* [*v. Maxwell*, 384 U.S. 333 (1966)], were held[]" rendered the proceedings unfair. *Murphy v. Florida*, 421 U.S. at 798–99. "In each of these cases, [the] Court overturned a state-court conviction obtained in a trial atmosphere that had been utterly corrupted by press coverage." Id. at 798.[4] Where media influence is not so pervasive as to render a trial presumptively unfair, however, "the burden of showing essential unfairness [must] be sustained by him who claims such injustice and seeks to have the result set aside, and . . . it [must] be sustained not as a matter of speculation but as a demonstrable reality." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281 (1942); *Beck v. Washington*, 369 U.S. 541, 558 (1962); *Darcy v. Handy*, 351 U.S. 454, 462 (1956). For "[i]f the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain [a] jury trial under the conditions of the present day." *Holt v. United States*, 218 U.S. at 251.

## B.

The convictions here, of course, were not "obtained in a trial atmosphere that had been . . . corrupted by press coverage." *Murphy v. Florida*, 421 U.S. at 798. The record reflects the trial was not "lacking in the

---

[4] "In *Rideau* the defendant had 'confessed' under police interrogation to the murder of which he stood convicted. A 20–minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place." 421 U.S. at 799.

"The trial in *Estes* [was] conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment." *Id.*

The trial in *Sheppard* was "infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival." *Id.*

solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." *Id.* at 799. And juror exposure to the purportedly prejudicial media accounts of what happened to the defendant and his daughter occurred six months before trial.

The record further indicates the trial judge personally examined those prospective jurors who had been exposed to the media coverage. He apparently was satisfied from their responses that a jury of impartial persons could be impaneled, and we cannot say his assessment was manifestly wrong. We would have to say the defendant failed to meet his burden of demonstrating unfairness.

### IV.

Proceeding from the foregoing unproved assertion of unfairness to the defendant's claim of error in the trial court's denial of the motion to suppress the recordings of his telephone conversations with a police agent, we begin our analysis by reviewing our rulings in *State v. Lester*, 64 Haw. 659, 649 P.2d 346 (1982), and *State v. Okubo*, 67 Haw. 197, 682 P.2d 79 (1984).

### A.

What the defendant would have us condemn was described as "consensual eavesdropping" or "participant monitoring" in *State v. Lester*, 64 Haw. at 663, 649 P.2d at 350. The incriminating statements the defendant sought to suppress there were made in the course of a conversation he had in a public park with a co-defendant, who unbeknownst to him was a government agent. The conversation was recorded by an electronic recording device concealed on the co-defendant's person. *Id.* The defendant sought to exclude the recorded conversation on grounds that the warrantless taping breached the Fourth Amendment, "article I, sections 6 and 7 of the Hawaii State Constitution[,] and [Hawaii Revised Statutes] chapter 803, part IV (Supp. 1981) ("Electronic Eavesdropping")[.]" 64 Haw. at 662, 649 P.2d at 350 (footnotes omitted).

A plurality of this court concluded no constitutional or statutory violation occurred because "one of the parties was a willing participant [who] consented to the eavesdrop[]" and the "overwhelming weight of authority

[has] upheld these warrantless consensual or participant eavesdrops." *Id.* at 663, 649 P.2d at 350. Relying on *Lopez v. United States*, 373 U.S. 427 (1963), *United States v. White*, 401 U.S. 745 (1971), and *United States v. Caceres*, 440 U.S. 741 (1979), the plurality reasoned no Fourth Amendment violation was involved because "the government agent [was] free to testify to what was heard and the tape merely preserve[d] his credibility[.]" *State v. Lester*, 64 Haw. at 664, 649 P.2d at 351. It also saw "no compelling reason to afford greater minimum protection" under the State Constitution in the situation at hand. *Id.* at 665, 649 P.2d at 352. Nor did it "find merit [in the defendant's] argument that the use of the recording device by the government constituted 'bugging,' in violation of [the provisions of] Hawaii's Wiretap Law [which were then in effect]." *Id.* at 668, 649 P.2d at 353.

Two years later, warrantless "consensual eavesdropping" was reviewed by this court "[b]ecause of the change in the composition of [the] court," and the reasoning of the plurality in *State v. Lester* was adopted by the majority in *State v. Okubo*. 67 Haw. at 200, 682 P.2d at 81. Thus, the recording of a private conversation with the consent or cooperation of a participant is not subject to constitutional regulation.

### B.

The defendant, however, avers a reconsideration of this court's position is "especially appropriate in light of the facts in this case which show that the monitoring was not a simple matter of attaching a listening device directly to the phone of the cooperating individual, but a much more complicated procedure involving a three–way conference monitoring by [a detective] from the police department." He argues "the complicated conference call monitoring used . . . in this case was not specifically approved in *Okubo* and should not be tolerated."

*Okubo*, however, represents an acceptance and affirmation of the Supreme Court's reasoning in *Lopez*, *White*, and *Caceres*, the essence of which is captured in the following passage from *White*:

> If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent

to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

401 U.S. at 751. Whether monitoring is subject to constitutional regulation or not, therefore, does not turn on the complexity of the procedure employed, and we find no compelling reason to review this court's position on "consensual eavesdropping" or "participant monitoring."

## V.

The defendant's succeeding point of error covers the denial of his other motion to suppress evidence, one which sought the suppression of evidence seized from his apartment on the ground that the warrant for the search was defective. The warrant, he claims, was defective because "the State authorities had no valid basis for questioning [his] child and . . . whatever information [they obtained] should not have been released to [the] police for criminal investigative purposes without a court order[.]" [5]

## A.

We begin our discussion of this claim of error with a look at the statute empowering the Department of Human Services (DHS) to investigate reports of harm, imminent harm, and threatened harm to a child, HRS § 587–21(a). On March 3, 1987, when the department received a report concerning the defendant and his daughter, the subsection in relevant part read:

Upon receiving a report that a child has been harmed, is subject to imminent harm, or is threatened harm, the department shall cause such investigation to be made in accordance with this

---

[5] The defendant also claims the warrant was defective because it was "impermissibly overbroad" and the supporting affidavit contained an erroneous statement. But we conclude the term "narcotics paraphernalia commonly associated with the use and storage of controlled substances" was not so imprecise as to vitiate the warrant and the inclusion of erroneous information about the use of cocaine by the defendant in the supporting affidavit did not invalidate the warrant—the rest of the information in the affidavit was more than sufficient to support a finding of probable cause.

chapter as it deems to be appropriate. In conducting the investigation the department may enlist the cooperation of police officers for phases of the investigation for which they are better equipped.

HRS § 587–21(a) (1985). The subsection now reads:

Upon receiving a report that a child is subject to imminent harm, has been harmed or is subject to threatened harm, the department shall cause such investigation to be made in accordance with this chapter as it deems to be appropriate. In conducting the investigation the department may enlist the cooperation of police officers or other appropriate law enforcement authorities for phases of the investigation for which they are better equipped and the department may conduct a criminal history record check concerning an alleged perpetrator of imminent harm, harm, or threatened harm to a child.

HRS § 587–21(a). The department, therefore, is obliged to investigate any report of harm or threatened harm to a child. If the situation involves criminal activity the department is authorized to enlist the collaboration of the police, who obviously are better equipped to investigate reports of crime.

The defendant does not question the department's authority to investigate reports of harm befalling children. But he maintains "there was 'no reasonable cause' to believe that [his] child was in danger[]" and this court "should not permit evidence obtained [in the investigation] to be released without court order." Absent family court approval for the release of the information, he avers, "the information [the department] obtained from [his] daughter and passed on to [the police] was in effect the fruit of a poisonous tree and should not have been permitted to be used to provide the basis for a search warrant affidavit."[6]

---

[6] The novelty of the issue and the paucity of authority supporting the defendant's argument on this point led us to order the submission of supplemental briefs discussing the issue. The additional briefing, however, produced no precedent or case law we would deem apt in the circumstance.

## B.

A review of the Child Protective Act and relevant provisions of the Child Abuse Law, HRS chapter 350, reveals there is nothing in the statutes preventing the issuance of a search warrant based on information obtained by the department or the police while investigating a report that a child has been harmed or is threatened with harm.[7] The defendant, however, urges "the right to privacy, the right to privacy in family relationships, and the right of parents not [to] have their children interrogated by state authorities without parental consent" compel a ruling that calls for court approval before such information can be used "outside of the Family Court child protective proceedings."

We are mindful, of course, that family relations may be damaged when information secured from a child serves as the basis for an invasion of the privacy of a parent. But the defendant has not demonstrated in a convincing manner that the right of privacy guaranteed by the federal and state constitutions includes the right of a parent to be free of searches based on information supplied by his child. *See State v. Mueller*, 66 Haw. 616, 630, 671 P.2d 1351, 1360 (1983) (A freedom protected under the constitution must "be one 'ranked as fundamental' in the concept of liberty that underlies our society."). Contrary to the defendant's assertions, the State authorities had reason to question the child and to seek further evidence of his involvement in crime on the basis of what they learned from her.

Finding no merit also in the remaining points of error raised by the defendant, we affirm the judgment of the circuit court.

*Samuel P. King, Jr.* (King & King, of counsel) for appellant.

*Ellen B. Politano* (*Caroline M. Mee* on supplemental brief), Deputy Prosecuting Attorneys, for appellee.

---

[7] In fact, the Child Abuse Law now compels the department to transmit "relevant information concerning a case of child abuse or neglect [to the appropriate police department or office of the prosecuting attorney] when such information is required . . . for the investigation or prosecution of that case[.]" HRS § 350–2(b).