65 P.3d 143

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Caleb IULI, Defendant–Appellant.**

No. 24940.

Supreme Court of Hawai'i.

March 19, 2003.

Carolyn E. Hayashi (of Char Sakamoto Ishii Lum & Ching), on the briefs, Honolulu, for defendant-appellant.

James M. Anderson, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and ACOBA, JJ., and Circuit Judge DEL ROSARIO, assigned by reason of vacancy.

Opinion of the Court by MOON, C.J.

Defendant–Appellant Caleb Iuli appeals from the judgment of conviction and sentence entered on February 8, 2002 by the circuit court of the First Circuit, the Honorable David W. Lo presiding, for robbery in the second degree, in violation of Hawai'i Revised Statutes (HRS) § 708–841 (1993).[1] On appeal, Iuli contends that the trial court: (1) erred in denying his motion to excuse a juror for cause; (2) plainly erred in incorrectly instructing the jury on the elements of the offense of robbery in the second degree; (3) plainly erred in instructing the jury on robbery in the second degree based upon a threat of the imminent use of force in the absence of any evidence of such threat; and (4) plainly erred in allowing the prosecution's improper closing argument. For the following reasons, we affirm the trial court's judgment.

## I. BACKGROUND

The following evidence was adduced at trial. At approximately one o'clock in the morning on February 11, 2000, Scott Shimaura was driving into the Mililani Shopping Center parking lot when he noticed a car following behind him flashing its headlights. Shimaura entered a stall in the parking lot and the car quickly pulled into the stall next to his. As soon as Shimaura attempted to pull out of the stall, the other car reversed and blocked Shimaura's car from behind.

1. HRS § 708–841 provides in relevant part:
 (1) A person commits the offense of robbery in the second degree if, in the course of committing theft:
 (a) The person uses force against the person of anyone present with the intent to overcome that person's physical resistance or physical power of resistance;
 (b) The person threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with the property....

The driver of the car, identified later as Iuli, exited the car and approached the closed driver's side window of Shimaura's car and said, "Give me your money." Shimaura told him, "No." Iuli proceeded to walk around Shimaura's car looking in with a flashlight. After walking back to the driver's side window, Iuli said, "Give me your car." Shimaura stated that he had a clear view of Iuli. Shimaura again told him, "No." Iuli said several times, "Roll down your window. I want to talk to you." Shimaura responded "no" each time. Iuli then said he would break Shimaura's window if he didn't roll it down. Shimaura was frightened because he did not know what Iuli was going to do. Iuli attempted to break the driver's side window with a sharp instrument that he had retrieved from his car. Shimaura put his car in reverse and hit Iuli's car as he attempted to leave because he felt threatened and fearful. Iuli then got into his car to get away. Shimaura struck Iuli's car with his front bumper as he pulled out of the parking space. Shimaura then followed Iuli long enough to note the license plate number, which he testified was "MYS 133." Shimaura called the police immediately thereafter from the 24 Hour Fitness establishment located at the Mililani Shopping Center and submitted a written statement to Honolulu Police Department (HPD) Officer Brian Johnson, describing the incident and Iuli.

The following night, Officer Johnson responded to a call by a 24 Hour Fitness employee who stated that a car matching the description given by Shimaura had returned to the parking lot. Officer Johnson located the vehicle and found Iuli sleeping in the car. Officer Johnson woke Iuli, took photos of him and the damage to his vehicle, and took down his identification information. Officer Johnson was instructed not to arrest Iuli at that time because there were no other people available in the area for a lineup at the scene. However, on February 17, 2000, Shimaura went to the police station and positively identified Iuli from a photo lineup as the perpetrator of the incident on February 11, 2000.

On February 29, 2000, HPD Officers Bryson Apo and Wendell Takata identified the vehicle with licence plate number MYS 133 and followed the vehicle into the Mililani Shopping Center.[2] As Iuli exited the vehicle, Officers Apo and Takata pulled their unmarked police vehicle behind Iuli's vehicle. Both officers approached Iuli's vehicle, identified themselves as police officers, and displayed their police badges. Iuli then reentered his vehicle, locked the driver's door, and leaned over to lock the passenger side door. Officers Apo and Takata asked Iuli to exit the vehicle, but Iuli remained inside the vehicle and made a motion to start the ignition. Iuli then made a movement with his left hand towards the driver door panel. Officer Apo believed Iuli was reaching for a possible weapon and, therefore, drew his firearm, pointing it directly at Iuli. Iuli eventually exited the vehicle and was arrested. Iuli was charged on March 10, 2000 with robbery in the second degree, in violation of HRS § 708–841.

At trial on April 9, 2001, the court conducted voir dire examination of potential jurors. During the jury selection process, the following exchange occurred between the court and Virginio Carvalho, one of the prospective jurors:

The Court: Does anyone have relatives or close friends employed by any law enforcement agency or criminal defense attorney and who might talk about their work with you?

Carvalho: [M]y dad was a police officer and all my uncles were policemen, and—and my brother just retired as a police chief on the island of Hawai'i, so I've been associated with that.

The Court: Does that association with law enforcement in your family and relatives cause you to be biased in any way?

Carvalho: I would think so. I'd have to be honest, I would think so.

The Court: Do you feel despite that, being related to law enforcement personnel, despite that, you could still be fair and impartial; is that correct? You'll try?

---

2. Officers Apo and Takata work in the Crime Reduction Unit, which is a plainclothes unit assigned to assist the Patrol Division of the HPD.

Carvalho: No, I didn't say that.

The Court: I misheard you then.

Carvalho: I think that for all of those years, that it may be very difficult to be fair and impartial.

The court then asked all the prospective jurors, "Is anyone unable to keep an open mind until all testimony and evidence has been completed and after the Court has told you what the laws are that apply in this case?" There was no answer in the affirmative. The court further asked, "Is there anyone who has any other reason why they cannot be fair and impartial jurors?" There was no answer in the affirmative.

During voir dire by the prosecution, the following exchange occurred with Carvalho:

Prosecution: You said you were a juror before; is that correct?

Carvalho: Yes.

Prosecution: What kind of case was that?

Carvalho: Civil.

Prosecution: Okay. Were there any police officer witnesses in that case?

Carvalho: Yes.

Prosecution: Were you able to treat those police officers just like any other witness?

Carvalho: Yeah.

Prosecution: Okay. So if there were police officers in this case, do you believe you could treat them just like any other witnesses?

Carvalho: Sure.

Prosecution: Sure?

Carvalho: I think so.

During further questioning of Carvalho by defense counsel, the following exchange occurred:

Defense counsel: Okay. Now, Mr. Carvalho, now—now, I guess we gotta go there because you've mentioned your affiliation—I guess your family being with law enforcement. And this is a criminal case, and now, you—do you feel uncomfortable sitting as a juror and in sitting in judgment on a criminal case because of the affiliations that you have with—with your family having been in law enforcement?

Carvalho: Not at all.

Defense counsel: Okay. And the fact that—well, as you sit here today, would you think that you—if a victim came in and said that, well, this happened to me, would you tend to want to believe him in spite of any other evidence that may come in?

Carvalho: If—if the—if the individual's a victim, probably.

Defense counsel: Okay. And despite what—say that there's—let's say there's a victim, but let's just say there's also other extenuating circumstances, would you tend to want to consider those circumstances or would you just want him to just say he's been a victim, he needs to be vindicated, I'm here to vindicate the victim?

Carvalho: Needs—need to be considered?

Defense counsel: Do you think that sitting in the chair that you would be placed in a position that you'd want to vindicate the victim, especially based on your law enforcement, you know, family—family ties?

Carvalho: That's a hypothetical question. I don't know that I could answer that.

Defense counsel: If it came to the wire and you had to make a decision, do you think that the decision should run in favor of the state or run in favor of the defendant?

Carvalho: All of my background says that the arrest wasn't made in vain.

Defense counsel: Right.

Carvalho: You know, that's what—that's what has been—

Defense counsel: That's right. So as you sit here and you look at Mr. Iuli, you go, well, he must have done something right, he wouldn't be sitting in the chair there?

Carvalho: (Nods head.)

Defense counsel: Right?

Carvalho: (Nods head.)

Defense counsel: So basically you've already had a preconceived notion that he may be guilty of maybe not this, but of something; is that right? Is there any-

body else in the jury box share that view ?

. . . .

Defense counsel: Okay. Well, let me ask you this: Do you think you can be fair and impartial to Mr. Iuli based on what you've just—just said, Mr. Carvalho, you know, that he may not be guilty of this, of something else?

Carvalho: Me?

Defense counsel: Yeah.

Carvalho: Tough call.

Defense counsel: Tough call meaning you don't think you can be, in all honesty, and it's just—

Carvalho: I'll try to be honest.

Defense counsel: Yeah. You're in a position—we'd want—you'd want somebody to be honest with you in the same position, right?

Carvalho: Sure, right.

Defense counsel: And based on that, do you think you could be fair?

Carvalho: As I said, it's a tough call. I don't know. . . .

Defense counsel challenged prospective juror Carvalho for cause and reasoned:

I'm very concerned about him. I mean, he's come right out at the very outset of this process stating this affiliation with law enforcement and his concerns whether he could, in fact, be fair and impartial, and I think that the answers he provided me also relay that fact, and he says it would be a tough call. I don't think there's a question of it being a tough call at all in a situation like this. I think that he would be better suited to serve in a civil case, but I don't [sic] think that we're concerned with him being fair and impartial.

The prosecution stated in response:

He also indicated that he doesn't know, he hopes he can be fair. He never indicated that he could not follow the Court's instructions. He has sat as a juror before where police officers were witnesses, and he was able to treat them as ordinary witnesses, as he did any other witness.

He also indicated upon questioning by this court that he was not biased against the defendant or the state. I think he's been honest with his concerns, but he's also been honest with his—honest and genuine effort to be fair and impartial. That's the best we can ask any prospective juror.

The court agreed with the prosecution's arguments and denied the challenge for cause. The defense used its first peremptory challenge to excuse Carvalho, and, thereafter, exercised its remaining two challenges prior to the final selection of the jury.

At the close of the prosecution's case, the defense moved for a judgment of acquittal on the basis that, given the state of the evidence adduced thus far, no reasonable juror could conclude guilt beyond a reasonable doubt and that the prosecution had failed to meet its burden of proof. The court denied the motion.

At the conclusion of the trial, the trial court instructed the jury in relevant part as follows:

A person commits the offense of Robbery in the Second Degree in one of two ways:

Alternative 1: A person commits the offense of Robbery in the Second Degree if, in the course of committing theft, he uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance.

There are two material elements of the offense of Robbery in the Second Degree under this alternative, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about the 11th day of February, 2000, in the City and County of Honolulu, State of Hawai'i, the defendant was in the course of committing theft; and

2. That while doing so, the defendant used force against Scott Shimaura, a person who was present, with intent to overcome that person's physical resistance or physical power of resistance.

Alternative 2: A person commits the offense of Robbery in the Second Degree if, in the course of committing theft, he

threatens the imminent use of force against the person of anyone who is present with intent to compel acquiescence to the taking of or escaping with property.

There are two material elements of the offense of Robbery in the Second Degree under this alternative, each of which the prosecution must prove beyond a reasonable doubt.

1. That on or about the 11th day of February, 2000, in the City and County of Honolulu, State of Hawai'i, the defendant was in the course of committing theft; and

2. That while doing so, the defendant threatened the imminent use of force against Scott Shimaura, a person who was present, with intent to compel acquiescence to the taking of or escaping with the property.

. . . .

Force means any bodily impact, restraint, or confinement or threat thereof.

There were no objections to the jury instructions noted above.

On February 8, 2002, the jury found Iuli guilty of robbery in the second degree. He was sentenced to ten years of imprisonment with a five-year mandatory minimum as a repeat offender and required to pay $496.63 in restitution. This timely appeal followed.

## II. *STANDARDS OF REVIEW*

### A. *Jury Selection*

■ A trial court's decision, on a challenge for cause of a juror is reviewed for an abuse of discretion. *State v. Kauhi,* 86 Hawai'i 195, 197, 948 P.2d 1036, 1038 (1997) (citation omitted). An abuse of discretion occurs when the trial court "exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Ganal,* 81 Hawai'i 358, 373, 917 P.2d 370, 385 (1996) (citations omitted).

■ "The paramount question in determining whether to excuse for cause a prospective juror is whether the defendant would be afforded a fair and impartial trial based on the law and evidence, with the prospective juror as a member of the jury." *State v. Cardus,* 86 Hawai'i 426, 438, 949 P.2d 1047, 1059 (App.1997) (citations omitted).

### B. *Jury instructions*

■ " 'When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading,' " *State v. Kinnane,* 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995) . . . .

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction . . . .

*State v. Jenkins,* 93 Hawai'i 87, 99–100, 997 P.2d 13, 25–26 (2000) (some citations omitted).

*State v. Lagat,* 97 Hawai'i 492, 495–96, 40 P.3d 894, 898–99 (2002) (some citations omitted) (brackets in original).

■ Nevertheless, the "trial court is not required to instruct the jury in the exact words of the applicable statute but to present the jury with an understandable instruction that aids the jury in applying that law to the facts of the case." *State v. Apao,* 59 Haw. 625, 645, 586 P.2d 250, 263 (1978), *subsequent resolution,* 66 Haw. 682, 693 P.2d 405 (1984). Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial. *State v. Robinson,* 82 Hawai'i 304, 310, 922 P.2d 358, 364 (1996). If that standard is met, however, "the fact that a particular instruction or isolated paragraph may be objectionable, as inaccurate or misleading, will not constitute ground for reversal." *[State v. ]Pinero,* 75 Haw. [282,] 292, 859 P.2d [1369,] 1374 [ (1993) ]. Whether a jury instruction accurately sets forth the relevant law is a question that this court reviews *de novo. Richardson v. Sport Shin-*

*ko (Waikiki Corp.),* 76 Hawai'i 494, 504, 880 P.2d 169, 179 (1994).

*State v. Vanstory,* 91 Hawai'i 33, 43, 979 P.2d 1059, 1069 (1999) (quoting *State v. Sawyer,* 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (some brackets added)).

█ "Jury instructions to which no objection has been made at trial will be reviewed only for plain error." *State v. Aganon,* 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (internal citations and quotation marks omitted), *reconsideration denied,* 97 Hawai'i 299, 36 P.3d 1269 (2002).

#### C. *Plain error*

█ "We may recognize plain error when the error committed affects substantial rights of the defendant." *State v. Klinge,* 92 Hawai'i 577, 584, 994 P.2d 509, 516 (2000) (citations omitted); *see also* Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (1993) ("Plain error or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.").

#### D. *Prosecutorial Misconduct*

█ Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. *See Klinge,* 92 Hawai'i at 590, 994 P.2d at 522 (citations omitted). Where a defendant fails to object to a prosecutor's statement during closing argument, appellate review is limited to a determination of whether the prosecutor's alleged misconduct amounted to plain error. *See id.* at 592, 994 P.2d at 524.

█ Misconduct of a prosecutor may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial. *Ganal,* 81 Hawai'i at 373, 917 P.2d at 385 (citation omitted).

### III. *DISCUSSION*

#### A. *Jury selection and denial of challenge for cause*

Iuli argues that the trial court erred in denying his challenge to dismiss prospective juror Carvalho for cause and, therefore, impaired Iuli's right to peremptory challenges because Carvalho repeatedly expressed his inability to be fair and impartial.

█ We note at the outset that Iuli could not have suffered any actual prejudice by virtue of Carvalho's potential bias because Carvalho did not ultimately serve as a juror. Nevertheless, the "right to exercise a peremptory challenge 'is one of the most important of the rights secured to the accused in a criminal case ... [and] the denial or impairment of that right ... is reversible error not requiring a showing of prejudice.' " *Kauhi,* 86 Hawai'i at 198, 948 P.2d at 1039 (quoting *State v. Carvalho,* 79 Hawai'i 165, 172, 880 P.2d 217, 224 (App.1994) (citation omitted, internal brackets omitted, internal brackets and some ellipses added)). This court must, therefore, examine "[ (1) ] whether [Carvalho] was improperly passed for cause and, if so, [ (2) ] whether [Iuli's] right to exercise a peremptory challenge was denied or impaired." *Kauhi,* 86 Hawai'i at 198, 948 P.2d at 1039.

#### 1. **Whether Carvalho was improperly passed for cause**

█ This court has previously stated that, "[w]hen a juror is challenged on grounds that he has formed an opinion and cannot be impartial, the test is 'whether the nature and strength of the opinion ... are such as in law necessarily ... raise the presumption of partiality.' " *State v. Graham,* 70 Haw. 627, 633, 780 P.2d 1103, 1107 (1989) (quoting *Reynolds v. United States,* 98 U.S. 145, 156, 25 L.Ed. 244 (1878)). The "prevailing rule[, however,] allows a person with preconceived notions about a case to serve as a juror if he 'can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Graham,* 70 Haw. at 633, 780 P.2d at 1107 (citations omitted).

█ In the present case, Carvalho admitted that his association with law enforcement would cause him to be biased. In response to the court's inquiry as to whether he would *try* to be fair and impartial, Carvalho replied

that "it may be very difficult to be fair and impartial." **Tr. 4/9/01 at 15–16.** In our view, Carvalho's agreement with the prosecutor that he could treat police officers like any other witness, in itself, did not adequately rehabilitate him as a prospective juror. Carvalho's responses to defense counsel's inquiries demonstrated that he had preconceived notions and partiality toward victims and police officers due to his association with law enforcement. For example, as noted above, he stated, "All of my background says that the arrest wasn't made in vain." In response to defense counsel's question, "So as you sit here and you look at Mr. Iuli, you go, well, he must have done something right, he wouldn't be sitting in the chair there," Carvalho nodded his head in the affirmative.

Moreover, Carvalho explicitly stated that it would be a "tough call" as to whether he could be fair. His statement, "I'll try to be honest," was ambiguous at best and certainly does not expressly signify, as the prosecution implies, that he would attempt to be *fair* and *impartial.* Furthermore, Carvalho did not assure the trial court that he would base his decision solely upon the evidence. *See State v. Ibanez,* 201 Ariz. 56, 31 P.3d 830, 832 (Ariz.Ct.App.2001) (stating that, if a prospective juror expresses serious doubts about her ability to be fair and impartial, she must be excused for cause, unless she ultimately assures the trial court that she will base her decision solely upon the evidence); *cf. Graham,* 70 Haw. at 635–36, 780 P.2d at 1108 (holding that the trial court did not err in refusing to excuse the prospective juror for cause because she expressly stated that she would *try* to be fair to the defendant and her responses during colloquy with the court dispelled the suggestion that she could not render a verdict based on the evidence). Carvalho's statements during voir dire were express declarations of bias. Carvalho did not affirmatively state that he could render a fair and impartial verdict.

We need not decide, however, whether the trial court abused its discretion in refusing to excuse Carvalho for cause because, as we discuss *infra,* Iuli has failed to meet his burden of establishing that his right to exercise a peremptory challenge was denied or impaired.

## 2. Whether Iuli has met his burden of establishing that his right to exercise a peremptory challenge was denied or impaired

In *Kauhi,* the defendant challenged the prospective juror for cause based upon the fact that the juror was a deputy prosecuting attorney, who was employed by the same office that was prosecuting him. *Kauhi,* 86 Hawai'i at 197–98, 948 P.2d at 1038–39. Satisfied that the prospective juror's responses during voir dire demonstrated his ability to be impartial, the trial judge denied the defendant's challenge for cause. *Id.* at 198, 948 P.2d at 1039. The defendant exercised his last peremptory challenge to excuse the prospective juror. Thereafter, he requested two additional peremptory challenges (which the trial court denied) and identified the jurors against whom he would utilize those challenges. *Id.* Under these circumstances, this court held that the trial court committed an abuse of discretion in failing to excuse the prospective juror in light of his employment and that the trial court's error foreclosed the defendant from peremptorily challenging at least one of two additional prospective jurors. This court, therefore, held that the defendant's right to exercise his peremptory challenge was denied or impaired, reversed his conviction, and remanded the case for a new trial. *Id.* at 200, 948 P.2d at 1041.

We cannot say, under the circumstances of this case, that Iuli has met his burden of establishing that his right to exercise a peremptory challenge was denied or impaired. Unlike the defendant in *Kauhi,* Iuli made no proffer that he would have excused another prospective juror had he not been forced to exercise one of his peremptory challenges to excuse Carvalho, nor did he request an additional peremptory challenge. *See United States v. Martinez–Salazar,* 528 U.S. 304, 317, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000) (holding that defendant's right to exercise peremptory challenges was not denied or impaired where defendant (1) never asserted at trial that he wished to strike some other

juror with the peremptory challenge he was forced to use and (2) did not question the impartiality of the jury as finally composed). We, therefore, hold that Iuli has failed to demonstrate that his right to exercise his peremptory challenges was impaired or denied.

### B. *Jury instruction on the elements of the offense of robbery in the second degree*

Although Iuli did not object at trial, Iuli argues on appeal that the jury instructions for robbery in the second degree were plainly erroneous because, in formulating the instructions, the trial court presented the two material elements in two parts rather than three. Relying on *Aganon*, Iuli contends that, due to the trial court's fundamental misunderstanding of the elements of the offense, the jury instructions on the requisite state of mind and the state's burden of proof were confusing and misleading. We disagree.

In *Aganon*, this court vacated the defendant's conviction and remanded the case for a new trial because the trial court's response to a jury communication erroneously stated that the jury must be unanimous in finding the requisite state of mind with respect to *either* the defendant's conduct, attendant circumstances, or result of her conduct. *Aganon*, 97 Hawai'i at 302–03, 36 P.3d at 1272–73. However, this court acknowledged that "not all offenses, as defined by the legislature, have all three possible elements." *Id.*, 97 Hawai'i at 303, 36 P.3d at 1273. The court in *Aganon* also held that, although the jury instruction on second degree murder erroneously listed the requisite state of mind as an element of the offense and listed the conduct and result of conduct elements together, the error did not adversely affect defendant's substantial rights because the instructions as a whole were not prejudicially insufficient, erroneous, inconsistent, or misleading. *See id.*

 This court has previously indicated that there are "two material elements of the offense of Robbery in the Second Degree, each of which the prosecution must prove

beyond a reasonable doubt." *State v. Haanio*, 94 Hawai'i 405, 421 n. 4, 16 P.3d 246, 262 n. 4 (2001); *see also Hawai'i Pattern Jury Instructions—Criminal* 10.29–10.30 (2002) (pattern jury instructions state that there are two material elements to the offense of Robbery in the Second Degree). The material elements of HRS § 708–841(1)(a) that the prosecution must prove beyond a reasonable doubt are: (1) the attendant circumstances (that the defendant was in the course of committing a theft); and (2) the conduct (that the defendant used force against a person who was present with intent to overcome that person's physical resistance or physical power of resistance). Proof of the result of conduct is not a material element of the offense of robbery in the second degree.[3]

Based on the foregoing, we hold that the trial court properly instructed the jury on the two statutory elements of the offense of robbery in the second degree as set forth in HRS § 708–841 and that the trial court's presentation of the material elements of the offense in two, rather than three, parts was not prejudicially insufficient, erroneous, misleading or inconsistent.

#### 1. Jury instruction on state of mind

 Iuli also contends that, because the court's instructions listing two material elements of robbery in the second degree was improper, and because the trial court instructed the jury on the requisite state of mind with respect to *three* elements instead of two, the jury instruction on the state of mind "became meaningless in the context of the court's description of the elements."

The trial court did not instruct the jury as to the specific language of HRS § 702–204, which states in relevant part that "a person is not guilty of an offense unless the person acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." However, the trial court instructed the jury on the requisite state of mind as follows:

A person acts intentionally with respect to his conduct when it is his conscious object to engage in such conduct. A person acts

**3.** The material elements for HRS § 708– 841(1)(b) are respectively similar.

intentionally with respect to attendant circumstances when he is aware of the existence of such circumstances or believes or hopes that they exist. A person acts intentionally with respect to a result of his conduct when it is his conscious object to cause such a result. The state of mind with which a person commits an act such as intentionally may be proved by circumstantial evidence.

Here, although the trial court presented the elements of robbery in the second degree as two material elements, but instructed the jury on the requisite state of mind with respect to three elements, the instructions taken as a whole was nevertheless understandable and did not render the state of mind instructions "prejudicially insufficient, erroneous, inconsistent, or misleading." *Kinnane*, 79 Hawai'i at 49, 897 P.2d at 976.

### 2. Burden of proof beyond a reasonable doubt

Iuli further contends that the jury instructions were insufficient because they did not instruct the jury as to venue, jurisdiction, and timeliness of prosecution.

██ HRS § 701–114 (1993)[4] requires proof beyond a reasonable doubt of each element of the offense, the state of mind required to establish each element of the offense, and facts establishing jurisdiction, venue, and timeliness. However, where uncontradicted and undisputed evidence of timely prosecution, jurisdiction, and proper venue is contained in the record, the trial court's failure to instruct the jury is harmless beyond a reasonable doubt. *See State v. Correa*, 5 Haw.App. 644, 650, 706 P.2d 1321, 1325, *cert. denied*, 68 Haw. 692 (1985).

In the present case, the record demonstrates that the prosecution adduced evidence establishing jurisdiction, venue, and timeliness and that the evidence was undis-

puted. We, therefore, hold that the trial court's failure to instruct the jury on these matters was harmless beyond a reasonable doubt.

### C. *Jury instruction on Robbery in the Second Degree based upon a threat of the imminent use of force*

██ Iuli contends that there was no rational basis to give a jury instruction on robbery in the second degree under HRS § 708–841(1)(b), based upon a threat of "the imminent use of force against the person or anyone who [was] present," because there was no evidence presented at trial of a "threat" against Shimaura.

██ A threat, within the context of the robbery statutes, is a "communicated intent to inflict harm ... [that] may be proven and often must be proven by circumstantial evidence and reasonable inferences to be drawn therefrom." *State v. Halemanu*, 3 Haw.App. 300, 305, 650 P.2d 587, 592 (1982) (citations omitted).

In the present case, there is ample evidence in the record and reasonable inferences therefrom that would support the theory that Iuli threatened the imminent use of force against Shimaura. Iuli demanded Shimaura's money and car and, after Shimaura refused, Iuli said he would break Shimaura's window if he didn't roll it down. Iuli went back to his car, retrieved a sharp pointed instrument and tried to break the driver's side window. Shimaura testified that, because he felt threatened and fearful, he reversed his car, striking Iuli's vehicle, in an attempt to leave the scene. In light of the foregoing, we cannot say that the trial court erred or plainly erred in instructing the jury on robbery in the second degree based upon a threat of the imminent use of force against the person.

---

**4.** HRS § 701–114(1) states in relevant part:
 (1) Except as otherwise provided in section 701–115, no person may be convicted of an offense unless the following are proved beyond a reasonable doubt:
 (a) Each element of the offense;
 (b) The state of mind required to establish each element of the offense;
 (c) Facts establishing jurisdiction;
 (d) Facts establishing venue; and
 (e) Facts establishing that the offense was committed within the time period specified in section 701–108.

## D. *Prosecutorial misconduct*

Finally, Iuli contends that the prosecution is guilty of misconduct because the prosecutor improperly: (1) commented on Iuli's assertion of his right to remain silent by noting that Iuli's refusal to voluntarily submit to police custody constituted evidence of his guilt; and (2) characterized Iuli's presence at the Mililani Shopping Center parking lot on the morning after the incident as tending to prove that Iuli habitually or voluntarily visited that parking lot.

 Because Iuli did not object to the prosecutor's alleged misconduct at trial, this court must, as a threshold matter, determine whether the alleged misconduct constituted plain error that affected Iuli's substantial rights. *See Ganal*, 81 Hawai'i at 376, 917 P.2d at 388. In so doing, this court considers "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." *Ganal*, 81 Hawai'i at 374, 917 P.2d at 386 (quoting *State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citation omitted)).

### 1. Right to remain silent

 During closing argument, the prosecutor stated:

State of mind, what else do we know? ... [Iuli] went back in the car after police approached him on February 29th, 2000. ... No evidence that he committed any traffic offense, no evidence that he committed anything. Someone approaches him, identifies himself as police, he gets back in his car. He locks his doors. Remember, he didn't just lock his driver's side door. He reached over and locked the front passenger's side, too. And he refused to comply with the police. This is not a misunderstanding. It's not like he thought he was being mugged by thugs. Both police officers displayed their badges. Both police officers kept on saying they were police while he's still inside the car, told him to come out, and he refused. He even almost started the engine to leave.

And he only exited after a gun was drawn on him. What does that show?

Well, the reason why it's under state of mind is because it shows that he knows he did something wrong. He knows that he's in trouble. He knows he's not just there to be talked to by the police. He's there to be arrested. When you look at the direct evidence, the circumstantial evidence, and the defendant's own actions, there's only one conclusion, the defendant is guilty as charged.

 The prosecution is permitted to draw reasonable inferences from the evidence, and wide latitude is allowed in discussing the evidence. *State v. Rogan*, 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (citations omitted) (stating that closing argument affords the prosecution the opportunity to persuade the jury that its theory of the case is valid, based upon the evidence adduced and all reasonable inferences that can be drawn therefrom). Because of the difficulty of proving the requisite state of mind by direct evidence in criminal cases, the state of mind of an alleged offender "may be read from his acts, conduct[,] and inferences fairly drawn from all the circumstances." *State v. Valdivia*, 95 Hawai'i 465, 473, 24 P.3d 661, 669 (2001) (citations omitted).

Here, the prosecutor simply recounted the evidence of Iuli's conduct to demonstrate his state of mind or consciousness of guilt. The prosecutor made no reference to any interrogation by the police officers or Iuli's refusal to answer their questions. Consequently, the prosecutor's comments cannot be said to have implicated Iuli's constitutional right to remain silent. Accordingly, there was nothing improper regarding the prosecutor's discussion of the evidence and the reasonable inferences drawn therefrom.

### 2. Evidence of habit

 In order to determine whether a defendant has acted in conformity with habit, two elements must be satisfied. First, "the evidence must be the regular practice of a person responding to a particular kind of situation. In this regard, 'the practice must be frequent, and it must be invariable or, at least, consistent.' Second, the habit must be specific." *Lee v. Elbaum*, 77 Hawai'i 446, 459, 887 P.2d 656, 669 (App.1993) (citation

omitted); *see also State v. Kelekolio*, 74 Haw. 479, 498 & n. 9, 849 P.2d 58, 66–67 & n. 9 (1993). Moreover, Hawai'i Rules of Evidence (HRE) Rule 406, states in relevant part:

Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

The prosecutor argued:

The ID in this case is not in question. It's a positive ID. On February 11, 2000, he had—[Shimaura] had a clear view of the defendant. He was able to see him. Yes, it was night. Yes, the windows were tinted. Yes, the windows were up. Yes, it happened quickly. But ask yourselves is it reasonable to believe that someone who is driving a car at night even with tinted windows can see outside those windows? Of course.... It wasn't the black—pitch-black of night in that parking lot. He said it was dimly lit. And at one point, defendant came this close. He was right in [Shimaura's] face.

February 12th, 2000, defendant was seen in the same car. Remember Officer Johnson. That's when this picture was taken. That's when these night photos were taken. And what's curious about February 12, 2000, he's there a little after midnight. February 11th, he's there around 1 o'clock in the morning, same time, same place. Shows frequency, shows that he knows the place, shows that he stays there. Remember he's found sleeping in the car.

February 17th, 2000, at this point, [Officer] Johnson has a name, Caleb Iuli.... [H]e brings Scott Shimaura to the police station. [Shimaura] says it's number 6, and number 6—you'll see that photo lineup. Number 6 is Caleb Iuli, the defendant.... February 29, 2000, defendant's seen in the same car again. Remember when he's stopped by Officer Takata and

Officer Apo. So the connection with the car solidifies the ID, because no one else that we know of, from the evidence presented, has access to that car or uses that car.

Considered as a whole, the prosecutor's argument clearly centered on the issue of *identification*, and not whether Iuli acted in conformity with *habit*. Thus, HRE Rule 406 is inapplicable in the present context.

Here, the prosecution utilized the evidence of Iuli's presence in the parking lot on February 12, 2000 as circumstantial evidence of Iuli's presence at the scene of the crime the night before.[5] The prosecution's commentary on the evidence and the reasonable inferences therefrom focused on rebutting Iuli's contention that Shimaura made a *misidentification*.

## IV. *CONCLUSION*

Based on the foregoing, we affirm the judgment of conviction and sentence of the trial court.

---

**5.** We note that, during a preliminary hearing held on April 9, 2001, the trial court denied Iuli's motion in limine to suppress evidence of Officer Johnson's observations on February 12, 2000, including the fact that Iuli was in his car in the 24 Hour Fitness parking lot on February 12, 2000.