**Electronically Filed
Supreme Court
SCWC-16-0000593
24-JAN-2020
07:46 AM**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

STATE OF HAWAI'I, Respondent/Plaintiff-Appellee,

vs.

WILLIAM ROY CARROLL, III, Petitioner/Defendant-Appellant.

_____

SCWC-16-0000593

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-16-0000593; 3PC151000386)

JANUARY 24, 2020

RECKTENWALD, C.J., NAKAYAMA, McKENNA, POLLACK, AND WILSON, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I.  Introduction

This case arises from the disappearance, recovery, and repair of a bronze spear attached to the bronze King Kamehameha I statue in Hilo, Hawai'i.  After a jury trial in the Circuit Court of the Third Circuit ("circuit court"),[1] William Roy Carroll, III ("Carroll") was convicted by a jury of two counts

---

[1]    The Honorable Glenn S. Hara presided.

of theft and one count of criminal property damage, and sentenced to five years' imprisonment.  On appeal to the Intermediate Court of Appeals ("ICA"), and now again on certiorari to this court, Carroll contends the circuit court erred by: (1) denying his challenge to two prospective jurors for cause, thereby violating his right to peremptory challenges; (2) denying his motion for judgment of acquittal based on insufficiency of evidence; and (3) improperly penalizing him in sentencing for exercising his right to a trial.  The ICA concluded Carroll's points of error lacked merit and affirmed the circuit court's judgment of conviction and sentence.  See State v. Carroll, No. CAAP-16-0000593, at 12 (App. Oct. 31, 2018) (SDO).

We hold the circuit court abused its discretion in denying Carroll's challenge for cause of Juror 48, which required him to exercise one of his peremptory challenges to excuse that juror and caused him to exhaust his peremptory challenges, thus impairing his right to exercise a peremptory challenge on a different juror.  This error requires his conviction be vacated and the case be remanded to the circuit court for a new trial.

We also hold, however, that because there was substantial evidence to support Carroll's convictions for the theft and criminal property damage offenses, double jeopardy principles do not preclude a retrial.

Based on our rulings on the first two questions on certiorari, we need not address Carroll's third question on certiorari regarding sentencing.[2]

We therefore vacate the ICA's November 27, 2018 judgment on appeal and the circuit court's July 26, 2016 judgment of conviction and sentence, and we remand this case to the circuit court for further proceedings consistent with this opinion.

## II.  Background

### A.  Factual background

On September 6, 2015, the top half of the spear that was a part of the King Kamehameha I statue located off of Kamehameha Avenue and Bishop Street in Hilo, Hawai'i, was observed missing. The spear, although a part of the statue, was no longer physically attached to it.  On September 8, 2015, during a police investigation of the scene, the missing top portion of the spear, wrapped in a torn half of a long-sleeved orange T-shirt and a thick chain attached to a pole, was located in the bushes off a trail near the statue.

### B.  Circuit court proceedings

#### 1.  Charges

On September 15, 2015, Carroll was charged via a felony information and non-felony complaint with three offenses:

---

[2]    We also need not address Carroll's assertion of error regarding the other juror.

3

(1) Count 1, theft in the second degree, in violation of Hawaiʻi Revised Statutes ("HRS") § 708-830(1) (2014) and HRS § 708-831(1)(b) (2014), for obtaining or exerting unauthorized control over a bronze spear valued at over $300 belonging to the Kamehameha Schools Alumni Association ("KSAA");[3]

(2) Count 2, criminal property damage in the second degree, in violation of HRS § 708-821(1)(b) (2014), for causing damage

---

[3]    "**Theft.**  A person commits theft if the person . . . [o]btains or exerts unauthorized control over property.  A person obtains or exerts unauthorized control over the property of another with intent to deprive the other of the property."  HRS § 708-830(1).

    "**Theft in the second degree**.  (1)  A person commits the offense of theft in the second degree if the person commits theft . . . [o]f property or services the value of which exceeds $300[.]"  HRS § 708-831(1)(b).

> **Valuation of property or services.**  Whenever the value of property or services is determinative of the class or grade of an offense, or otherwise relevant to a prosecution, the following shall apply:
>
>     (1)  Except as otherwise specified in this section, value means the market value of the property or services at the time and place of the offense, or the replacement cost if the market value of the property or services cannot be determined.
>
>     . . . .
>
>     (3)  When property or services have value but that value cannot be ascertained pursuant to the standards set forth above, the value shall be deemed to be an amount not exceeding $100.
>
>     (4)  When acting intentionally or knowingly with respect to the value of property or services is required to establish an element of an offense, the value of property or services shall be prima facie evidence that the defendant believed or knew the property or services to be of that value.  When acting recklessly with respect to the value of property or services is sufficient to establish an element of an offense, the value of the property or services shall be prima facie evidence that the defendant acted in reckless disregard of the value.

HRS § 708-801 (2014).

exceeding $1,500 to the King Kamehameha I statue, also belonging to the KSAA;[4] and (3) Count 3, theft in the third degree, in violation of HRS § 708-830(1) and HRS § 708-832(1)(a) (2014) for obtaining or exerting unauthorized control of a four-foot pipe and forty-foot chain valued at over $100 belonging to Bayfront Motors Incorporated ("Bayfront Motors").[5]

### 2. Pre-trial hearing regarding State's plea offer

At a May 4, 2016 hearing regarding other matters, the circuit court indicated it would be conducting what it called a "Frye hearing." The circuit court was apparently referring to Missouri v. Frye, 566 U.S. 134 (2012), in which the United States Supreme Court held that, "as a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." Frye, 566 U.S. at 145.[6] The State

---

[4]    "**Criminal property damage in the second degree.** (1) A person commits the offense of criminal property damage in the second degree if by means other than fire: . . . [t]he person intentionally or knowingly damages the property of another, without the other's consent, in an amount exceeding $1,500[.]" HRS § 708-821(1)(b).

[5]    "**Theft in the third degree.** (1) A person commits the offense of theft in the third degree if the person commits theft . . . [o]f property or services the value of which exceeds $100[.]" HRS § 708-832(1)(a).

[6]    The Court further stated:

The prosecution and the trial courts may adopt some measures to help ensure against late, frivolous, or fabricated claims after a later, less advantageous plea offer has been accepted or after a trial leading to conviction with resulting harsh consequences. First, the fact of a formal offer means that its terms and its

(continued. . .)

indicated it was offering to agree to a sentence of probation and also that any jail term would be equal to time served in exchange for Carroll's guilty or no contest plea as to Count 3 and either Count 1 or Count 2.  The State also agreed to take no position if Carroll requested a deferral.  The circuit court made clear that if Carroll accepted the plea offer, it would sentence Carroll to probation stating, "[a]s I see it, the real big plus is that you would be avoiding any exposure to prison."

---

(. . .continued)

> processing can be documented so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations. Second, States may elect to follow rules that all offers must be in writing, again to ensure against later misunderstandings or fabricated charges. See N.J. Ct. Rule 3:9-1(b) (2012) ("Any plea offer to be made by the prosecutor shall be in writing and forwarded to the defendant's attorney"). Third, formal offers can be made part of the record at any subsequent plea proceeding or before a trial on the merits, all to ensure that a defendant has been fully advised before those further proceedings commence. At least one State often follows a similar procedure before trial.

Frye, 566 U.S. at 146-47 (citations omitted).  Thus, the Court discussed possible measures to "help ensure against late, frivolous, or fabricated claims" brought by defendants regarding the existence of plea offers for lesser sentences than those eventually imposed.  As of the Court's 2012 opinion in Frye, it appears that perhaps only one state was conducting on-the-record discussions regarding plea offers.  Although Hawai'i Rules of Penal Procedure ("HRPP") Rule 11(f)(1) (2014) allows trial courts to participate in plea discussions, HRPP Rule 11(f)(2) does not require a plea offer to be communicated to a trial court unless a defendant accepts the State's offer, and there are other methods of memorializing that a plea offer was conveyed to a defendant but rejected without involving the trial court.  The most common method may be a defense attorney's notation in the file.  Although we need not address the merits of Carroll's sentencing issue on certiorari, we do note that detailed on-the-record inquiries by a trial court regarding the terms of a probation plea offer, with indications that the trial court would follow the offer and that refusing the offer could result in a prison sentence, can, as in this case, lead to questions regarding whether the trial court penalized a defendant for exercising trial rights.

Carroll declined the plea offer as supplemented to by the court and proceeded to trial.

### 3.  Jury selection

Jury selection began on May 9, 2016.  After the circuit court read the charges against Carroll during voir dire, it asked the jurors whether they[7] had any knowledge or information about the case from any source, including any media, friends, or any other sources.  Several prospective jurors indicated they had heard of the case through other sources.

Juror number 48 ("Juror 48")[8] responded she had been exposed to information regarding the case from the Hawaii Tribune-Herald newspaper.  She also stated she had heard comments made by her daughter and son-in-law and her three grandchildren who attended a Hawaiian language immersion school "who were impacted by" the case, and that she "may have heard something from" "another child who's a Hawaiian activist."  She could not recall who said what.  She stated her recollection regarding what she might have read was "[a]bout where the items were found" and "the condition of what -- where they found him."

She indicated she was raising the issue because she "just wanted everyone to know that I have the newspaper reports and I

---

[7]    "They, them, and their" are sometimes used as singular pronouns when (1) the gender identity of a person referred to is unknown or immaterial; or (2) those are the pronouns of a specific person.

[8]    After preliminary excusals, Juror 48 became juror number 12.

may have heard something somewhere along the line.  What, I couldn't be specific just because my children are very involved in Hawaiian activities and the statue is important to them." Juror 48 explained that she recalled reading where the items were found, but that she could not discern "what else was added . . . by [her] children" who were "very upset that the statue was desecrated," "[t]hat things were missing," "[t]hat what was done to the statue was not appropriate," and that "[s]omething should be done."

The circuit court stated that "[not] too many people would disagree with those sentiments," and asked:

> THE COURT:  Despite what you, um, may have, uh, read about and you might have had some reactions, uh, from your own family about, uh, this incident do you think you can set that aside and in essence and, um, presume Mr. Carroll, the defendant, here to be innocent until he is proven guilty beyond a reasonable doubt by the evidence in this case?
>
> [JUROR 48]:  I would certainly do my best to do that. However, I do come from a, um, my husband and others were very much, uh, of the opinion that if it does get to court there's a lot of -- got to be a lot of proof somewhere. That that's the way it is.

(Emphasis added.)

Juror 48 went on to state that she "would definitely try [her] best" to find Carroll not guilty if the State did not produce sufficient evidence to overcome the presumption of innocence.  But, after further colloquy with the circuit court, Juror 48 confirmed she "presum[ed] [Carroll] guilty until he [could] prove his innocence" with "pretty good evidence":

8

> THE COURT: Okay. If you made a conscientious effort to do that what would be your confidence level or your -- your, um, evaluation of your abilities to do that successfully?
>
> [JUROR 48]: If, uh, the evidence points that he was not the one then I would be able to say that, um, I would be able to overcome but I've -- I've heard --
>
> THE COURT: Okay.
>
> [JUROR 48]: -- but again it would have to be pretty good evidence.
>
> THE COURT: Okay. But, okay, in essence what you just told me is you're presuming that the evidence -- you're presuming him guilty until he can prove his innocence. You understand?
>
> [JUROR 48]: I understand, but I'm -- I'm saying --
>
> THE COURT: But that's what you're --
>
> [JUROR 48]: -- yes.
>
> THE COURT: -- that's what your orientation is right now?
>
> [JUROR 48]: Right now.

(Emphases added.) Juror 48 then stated, however, that if she were selected to sit on the jury, she would be able to put aside the feelings of her family members about the incident when making her decision because she would follow the circuit court's instructions. She also stated:

> So I really I would try to go by evidence. I've watched a lot of, uh, my husband very much loved all the court cases he could possibly watch. Well, he was bedridden and, uh, so I've seen a lot of those things which I know are not true, but I know sometimes thing do not come out the way it sounds like from the first.

Questioning by the circuit court of Juror 48 continued as follows:

> THE COURT: Okay. [Juror 48], you know, I need to clarify certain things because I'm getting some very conflicting answers from you, and maybe it's because you're a little

9

nervous and because you may not be understanding some of the questions so let me try again here.

First of all whatever it is, you know, in terms of any kind of bias or feelings or -- or, uh, whatever you may have with respect, um, to, uh, what happened in this case about the statue, your – your kids' reaction to it and everything, you know, I can't unring the bill [sic].

And we're all human. We're gonna have biases and prejudice we pick up throughout our entire lives. Uh, I have my own but, uh, and I'm sure the prosecutors have their own.

But when you become a juror and/or you become a judge like me, you know, you have to make a conscientious effort to identify those biases to say what it is that might affect your judgment in that particular case and tell yourself conscientiously, "I can't let those biases interfere with being fair and impartial. That cannot be the basis of my decision."

In other words I won't change you. I won't change your biases. I won't change your feelings, but once you identify what those are as to whether or not they affect your decision in a case as a juror you have to set 'em aside. You think you can do that?

[JUROR 48]: Yes.

THE COURT: Okay. The other thing I think I need, uh, some assurance of is that also as I indicated earlier jury and jury verdict, um, have to be based on the evidence presented in court.

So when we have the possibility of a juror having information from outside the court they will have to engage in almost a very similar type of exercise in terms of saying, "Well, I cannot forget what I know but I can disregard it. I can set it aside," just like I'm required. I know a lot of things but I have to say I can't consider that when I have a trial and I have to make a decision.

Would you be able to do that as a judge of the facts in this case? In other words render your verdict only on the evidence that's presented in court and not consider -- I'm not saying forget but not consider whatever kind of information you might have gotten from your family, from the newspapers in rendering a verdict. You can do that?

[JUROR 48]: Yes.

THE COURT: So if those thoughts came into your mind during a trial you would -- and this is why we going over what it is that you might recall -- you have to say, "Oh, I can't consider that," and just push it aside. You may not forget it but just push it aside and not use that or discuss that or bring it up in deliberations during, um, deliberations as a juror. Do you think you can do that?

[JUROR 48]: Yes.

THE COURT: As to all of these things that I ask you whether or not you'd be able to do as a juror to what degree of certainty or confidence do you think you'd be able to be successful if you conscientiously tried to, um, do these things?

[JUROR 48]: 90 percent.

THE COURT: So you're fairly -- very, very confident?

[JUROR 48]: Yes.

THE COURT: Okay. Thank you. Any further questions?

[DEPUTY PROSECUTING ATTORNEY]: Nothing from the State.

THE COURT: Okay. [DEFENSE ATTORNEY]?

[DEFENSE ATTORNEY]: Just one further question, ma'am.

THE COURT: Go ahead.

[DEFENSE ATTORNEY]: You had said that, um, when the -- just before the Judge asked you so you -- you were stating something that sounded like you were presuming he was guilty and the evidence would have to be good. Is that extra 10 percent that you -- in your certainty level, is there a bit of if that you would want Mr. Carroll to somehow prove to you that he's not the one or prove to you that he's innocent?

[JUROR 48]: I guess my feeling on that has to be on the fact that, um, I have a lot of faith in the police and that what they do and, um, what they put together and who they arrest. That would be the 10 percent.

[DEFENSE ATTORNEY]: Okay, and so because of that faith and belief, um, there is gonna always be a part of you that you'll want Mr. Carroll or any defendant that made it to a trial level to have to prove to you that they're not, um, the one? That -- that somehow the police got it wrong or something went wrong. You would want a little bit of proof of that?

[JUROR 48]: Uh, I would base my opinion on what proof there is.

[DEFENSE ATTORNEY]: Mmm-hmm.

[JUROR 48]: Um, I guess also I would feel that if there was proof it's got to be somewhat sustainable or why would it be proved?

Carroll then challenged Juror 48 for cause, arguing:

[S]he never let go of her idea that even if it's 10 percent it's still 10 percent burden of proof being placed upon Mr. Carroll to somehow prove his innocence.

. . . .

I think that she will not be able to give Mr. Carroll the full presumption of innocence nor will she be able to give the State the full burden of proof they have.

The circuit court denied Carroll's challenge, stating that Carroll had misconstrued Juror 48's answers:

[W]hat we're looking here for in terms of this voir dire was basically what she would do with the knowledge she might have had about the case and whether or not she might have had some inclination about Mr. Carroll's guilt or innocence and whether she could put that aside.

The 90 percent was her confidence level that if she conscientiously tried to do that she would be able to succeed. That's a fairly high degree of confidence that I think the Court would be willing to accept under the circumstances where, you know, you have somebody who has this task of -- of sorting out information and being able to decide what he can use, what they can't use. It's not a 10 percent of shifting burden. I think that's a misconception.

The other thing is that I will be going over in other voir dire things like police testimony. I'll be going over evaluation of testimony, also the concept of proof beyond a reasonable doubt and what is a reasonable doubt.

And I think all of those things will probably wash, you know, come out in the wash with [Juror 48], and you'll also have another chance each of you to voir dire her. So at this point I'm just going to leave her on because I'm satisfied with the answers with respect to the limited voir dire that we had. Okay.

Additional voir dire was conducted on May 10, 2016. In response to the circuit court's questioning, Juror 48 indicated that Hawaiʻi Police Department Criminal Investigation Section Lieutenant Gregory Esteban, who was later called as a witness and testified he assisted in the investigation and found the missing top portion of the spear in the bushes, was a friend of her husband's through a community watch program in which her

husband was involved, but that she could evaluate his testimony like any other witness.  In response to the circuit court's questions with respect to whether any of the prospective jurors had relatives or close friends employed by a law enforcement agency, Juror 48 responded that her son had been a corrections officer on Maui for about twelve or fifteen years, but that this would not affect her ability to evaluate the testimony of law enforcements officers if they came to testify.  In response to the deputy prosecuting attorney's questioning, Juror 48 initially responded that she thought direct evidence had a little bit more weight than circumstantial evidence, but in response to a follow-up question regarding whether, if the circuit court instructed the jurors to give direct and circumstantial evidence equal weight, she would be able to follow its instruction, Juror 48 responded in the affirmative.

After this additional voir dire, Carroll renewed his challenge for cause of Juror 48 based on her statements the day before.  Carroll argued Juror 48 "had made statements that Mr. Carroll would have to provide some evidence in order to sway her that he is innocent, and even towards the end of voir dire, she had stated that her 10 percent uncertainty was based on the fact that she still would want some evidence from Mr. Carroll."

The circuit court again denied the challenge for cause of Juror 48 based on: (1) the reasons it had stated the day before

regarding the "10 percent"; (2) Juror 48's statements during further voir dire that "she would listen to both sides and she could be fair and impartial"; and (3) additional voir dire by both the State and the defense indicating that Juror 48 "would be applying the laws with respect to presumption of innocence and the burden of proof required."  The circuit court stated that Juror 48 "answered basically all of the questions like all of the rest of the jurors, that they would apply the law that would be applicable."

Carroll exhausted his peremptory challenges, and had to use two of his peremptory challenges to dismiss another challenged juror and Juror 48.  Had Juror 48 been excused for cause, Carroll would have used the peremptory challenge exercised on Juror 48 to excuse another juror.  Defense counsel stated:

> Um, for the record I would be requesting two more peremptory challenges. That would be based on the fact that we had asked for [] Juror No. [35] earlier, and [] Juror No. [48], we had challenged them being seated. We would have used the two extra peremptory challenges to get rid of [two other jurors].

The circuit court denied the request for additional peremptory challenges.[9]

---

[9]    As noted, the other challenged juror was juror number 35 (later identified as juror number 7).  Because, as discussed below, Carroll exhausted his peremptory challenges and was foreclosed from peremptorily challenging at least one of two additional prospective jurors he had wanted to excuse, his right to exercise a peremptory challenge on another juror was based on the circuit court's failure to excuse Juror 48 for cause.  We therefore need not address Carroll's assertion that juror number 35 should have also been excused for cause.

###     4.     Trial evidence relevant to issues on certiorari

On certiorari, Carroll does not contest evidence identifying him as the perpetrator of the acts.[10]  Rather, Carroll contests whether there was sufficient evidence regarding the value of the property allegedly taken.  Specifically, Carroll alleges there was insufficient evidence that the top half of the statue's spear exceeded $300 in value (Count 1) and that the chain and pole belonging to Bayfront Motors exceeded $100 in value (Count 3).  Carroll also contests whether there was sufficient evidence that the value of the damage to the statue exceeded $1,500 (Count 2).[11]

With respect to Counts 1 and 2 regarding the spear and statue, an officer of the East Hawaii Region Mamalahoe Chapter of the KSAA ("KSAA officer") testified that the King Kamehameha I statue had been given to the KSAA by the Princeville Corporation on Kaua'i in 1996.  The statue was not mass produced, and had been cast in bronze in Italy with some gold leaf.  The Princeville Corporation initially planned to install the statue

_____

[10]     The trial evidence included, in sum, a surveillance video recorded by Bayfront Motors, which showed a man — with the same haircut as Carroll, dressed in the same manner as Carroll on September 5 and 6, 2015, and who walked with the same gait as Carroll — had walked away from Bayfront Motors with the pole and chain.  Identification of Carroll as the perpetrator is not raised as an issue on certiorari.

[11]     Although for sentencing purposes, Count 2, the criminal property damage charge regarding the statue, was merged into Count 1, the theft charge regarding the spear, if only the conviction on Count 1 was vacated, it is possible that Carroll could be instead be subject to sentencing on Count 2. We must therefore address both counts.

on one of its Kaua'i developments, but after public objection,[12] the Princeville Corporation gave it to the KSAA to have the statue installed in Hilo.

In 1996, the KSAA officer had been a member of the steering committee created to seek grants to pay for the installation of the statue. He had also served as the general contractor for the statue's installation. As of the date of trial, the KSAA officer remained a licensed general contractor. Additionally, he had continued serving as a member of the steering committee, as the permit for the statue tasked KSAA with its continued maintenance. For example, the statue had been restored in early 2000. As the only remaining member of the original steering committee, the KSAA officer was the custodian of all records pertaining to the acquisition of the statue.

The KSAA officer was asked by the State to render opinions as an estimator and general contractor, as he had determined the fair market value of contracting work or projects on numerous occasions. During preliminary questioning by defense counsel regarding his qualifications to render such opinions, the KSAA officer acknowledged he had no experience in appraising fine art, sculptures, or statues; that he did not deal in sculptures or statues; that he did not have experience in sculpting or

---

[12]     The objection was based on the fact that King Kamehameha I had never conquered Kaua'i.

creating statues; that he was not familiar with the foundry work to create a statue; and that he was not aware of the exact metal composition of the King Kamehameha I statue.

The KSAA officer testified the stated value of the statue at the time of the 1996 gift was $80,000.  He was permitted to testify as to his opinions, and based on the material composition of the spear and the portion of the entire statue it constituted, he estimated the value of the taken top half of the spear was about $2,500.  The KSAA officer also opined the repair cost for the spear would have been about $2,500 based on what he saw of the spear, the damage, and what it would take to reconnect the top half to the bottom half.

The KSAA officer also testified it would have cost $3,500 to repair other damage to the statue's chest and legs, based on "what [he] saw as the type of restoration work that would be needed[,] . . . and based on what [his] recollection of the first time that [the KSAA] had the statue restored back in early 2000[.]"  That restoration project had taken several weeks.  He stated, "[W]e had to build a platform around the statue for the person to attend to each portion of the statue.  Based on what I saw back then I just, you know, figured out the amount of manpower -- man hours would take.  And I just guessed at what the material costs would have been."

17

More specifically, the KSAA officer testified that to reattach the two pieces of the spear, he had taken the pieces to another person, who attached a series of pins to the spear in December 2015 and did not charge for his services. He also indicated that before the entire spear was reinstalled, the bottom half of the spear had to be removed from the statue so that the recovered top half could be reattached. As the statue was fourteen feet tall, a manlift and lowbed had been used to lift the bottom half of the spear out through the statue's outreached hand. The labor to perform these services, as well as use of the necessary equipment, had been provided by the KSAA officer's family company; the KSAA officer had previously worked as a construction representative for his family company.

Based on his training and experience as a general contractor and estimator, the KSAA officer estimated that such services and labor, coupled with expenses to return all of the equipment, would have cost about $1,000. Similarly, to reinstall the repaired spear, a crane or similar equipment had been required. According to the KSAA officer, use of a crane would have cost $1,000 and the requisite labor would have raised the total cost to $1,500. The KSAA had not needed to pay for these services because use of the equipment had been donated and all labor had been performed by volunteers.

With respect to Count 3 charging theft in the third degree of the chain and pole "the value of which exceeds $100," a manager from Bayfront Motors testified.  The chain and pole had been placed in a planter box in front of the property.  The manager testified he had purchased the chain and pole in either 2010 or 2011 from Home Depot for a total cost of approximately $135; the pole was purchased for "[r]oughly $15," and the chain was "[r]oughly $3 a foot."

After the State concluded presenting its evidence, Carroll moved for a judgment of acquittal, arguing the State failed to meet its burden of proving the value of the spear or the pole and chain, and the cost to repair the statue.  The circuit court denied the motion for judgment of acquittal as to all three counts.

After the State's case-in-chief, the defense did not call any witnesses or present any additional evidence.

### 5.    Conviction

On May 20, 2016, the jury found Carroll guilty as charged for all three counts.  In a special interrogatory, the jury found the State did not prove beyond a reasonable doubt that Counts 1 and 2 were not part of a continuing and uninterrupted course of conduct and that Carroll did not have separate and distinct intents.  Based on the special interrogatory and

merger, the State elected to go forward on Count 1 for sentencing.[13]

### 6.    Post-verdict motion for new trial

Before sentencing, Carroll filed a motion for new trial on June 3, 2016.  He asserted he should not have been required to use two of his peremptory challenges to dismiss two jurors when they should have been dismissed for cause.  He alternatively argued that he should have been granted two additional peremptory challenges.  The State opposed Carroll's motion, arguing the circuit court had properly denied Carroll's challenges for cause of Juror 48 and the other juror, as the circuit court had engaged in extensive colloquies with each and was satisfied with their responses.  The circuit court denied the motion for new trial.

### 7.    Sentencing

Carroll was sentenced on July 26, 2016.  At the sentencing hearing, defense counsel indicated Carroll maintained his innocence.  When the circuit court asked whether Carroll wished to make a statement before sentencing, Carroll answered in the affirmative.  He stated that he respected the circuit court, that he was willing to abide by any terms of probation if

---

[13]    Count 1, theft in the second degree, and Count 2, criminal property damage in the second degree, are both Class C felonies, punishable with up to five years imprisonment.  HRS §§ 708-821(2), 708-831(2), and 706-660(1)(b) (2014).  Count 3, theft in the third degree, is a misdemeanor, punishable with up to one year imprisonment.  HRS §§ 708-832(2) and 706-663 (2014).

granted, that it had been difficult for him to be separated from his daughter since being incarcerated, and that he had missed a trip with his family.

Addressing the HRS § 706-606 sentencing factors,[14] the circuit court relied on the pre-sentence report prepared by a judiciary probation officer, and stated in part:

> At one time you told a security officer at the welfare office, "Yeah, I'm the guy that did it," and when you were interviewed by the probation officer you deny taking the spear or having anything to do with the offenses charged here, and that's in the face of clear evidence that was produced at trial. Evidence which indicated that you were the person dragging the chain that was taken from Bayview, uh, Bayfront Motors, and they're [sic] videos that I think clearly showed some very identifying characteristics in terms of your general dress and more importantly I think there was one brief but clear shot of your hairdo which was very unique at that time.
>
> Other evidence includes that the chain that was taken, the spear that was taken and an orange T-shirt was found all wrapped together by the police, and there was evidence to indicate that you had an orange shirt -- T-shirt a few hours before where the police observed you at a

---

[14] **Factors to be considered in imposing a sentence.** The court, in determining the particular sentence to be imposed, shall consider:

(1)  The nature and circumstances of the offense and the history and characteristics of the defendant;
(2)  The need for the sentence imposed:
(a)  To reflect the seriousness of the offense, to promote respect for law, and to provide just punishment for the offense;
(b)  To afford adequate deterrence to criminal conduct;
(c)  To protect the public from further crimes of the defendant; and
(d)  To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3)  The kinds of sentences available; and
(4)  The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

HRS § 706-606 (2014).

bar where I think an acquaintance got injured and you tried to help that person.

Now, all of this evidence I think when you look at it separate and by itself would probably not have been enough to convict you of the offenses but when taken together I think it paints a very clear picture that you had knowledge of what was being done or what had been done, and there was evidence that tied you in beyond your own statements. Your T-shirt. And the chain. And the video.

So again even in the face of this kind of evidence you tell the probation officer, "I didn't have anything to do with it," it really indicates to me that you do not have the ability at this time to be upfront and truthful.

The reason I'm pointing these things out is among other things that I need to consider are also considerations in, as [the deputy prosecuting attorney] pointed out, Section 706-621, and these are factors to be considered, uh, to consider in imposing a term of probation.

And one of them I think is whether or not you can be rehabilitated on probation. To be successful on probation requires I think two very important commitments on your part and conduct on your part. One is to comply with the terms and conditions of probation.

Given your track record and your disregard for the law -- and that's why I pointed it out earlier -- I believe that there will be serious violations of the terms of your probation if you were granted probation because of your lack of ability to comply with the terms, uh, with the law of this community. How are you gonna comply with the terms of probation?

Second was also very important is that you be truthful with your probation officer and the Court. Part of probation is trying to rehabilitate you to provide services and help, but if you're not truthful with the Court or your probation officer how do we know what help you need?

Carroll was sentenced to five years imprisonment.[15] The circuit court denied Carroll's request for a stay pending appeal.

## C. Appeal to the ICA and and certiorari application

In his appeal to the ICA, Carroll presented three points of error:

---

[15] A five-year term of imprisonment was imposed for Count 1. A one-year term of imprisonment was imposed for Count 3 to run concurrently with the five-year term.

> A.    Carroll's challenges to jurors for cause were erroneously denied and Carroll's right of peremptory challenges was violated.
>
>        . . . .
>
> B.    The trial court erroneously denied Carroll's Motion for Judgment of Acquittal.
>
>        . . . .
>
> C.    The trial court's sentence improperly penalized/punished Carroll for exercising his right to trial.

The ICA rejected the challenges.

As to the first point of error, the ICA concluded, inter alia, the circuit court did not abuse its discretion in denying Carroll's challenges for cause of Juror 48 and the other juror. Carroll, SDO at 7.  The ICA observed that the media coverage referred to by both jurors was nearly a year old and consisted of mostly factual, non-prejudicial information, such as where the spear had been recovered, its condition, and "mention that a homeless man may have been responsible for the incident." Carroll, SDO at 6.  According to the ICA, such coverage was not a "barrage of inflammatory publicity immediately prior to trial amounting to a huge . . . wave of public passion," and therefore did not rise to the level of presumed prejudice, quoting State v. Keohokapu, 127 Hawai'i 91, 103, 276 P.3d 660, 672 (2012). Carroll, SDO at 6-7 (ellipsis in original).  The ICA indicated Juror 48's disclosure of her prior conversations with her children indicating that they were very upset that the statue had been damaged was not different from how most members of the

23

public must have felt about the incident. Carroll, SDO at 7. The ICA ruled that, therefore, none of the outside influences on Juror 48 rose to the level of presumed prejudice. Id.

As to the second point of error, the ICA ruled that although the KSAA officer was not qualified as an expert in the field of fine arts or sculptures, expert testimony is not required to establish the value of stolen property. Carroll, SDO at 9. The ICA also ruled that evidence of the cost of reasonable repairs is an appropriate means to establish the amount of damages as an element of the crime of criminal property damage. Id. The ICA therefore ruled the KSAA officer's testimony was sufficient to support Carroll's conviction on Counts 1 and 2. Id. Further, as to Count 3, the ICA ruled the testimony of the Bayfront Motor's manager regarding the purchase price of the stolen pipe and chain in 2010 or 2011 was adequate evidence for the jury to determine whether the stolen property's value exceeded $100 at the time of the offense. Carroll, SDO at 10.

As to the third point of error, the ICA ruled the circuit court properly considered the HRS § 706-606 sentencing factors, arguments by counsel, and the nature of the offense before determining Carroll's five-year imprisonment was an appropriate sentence. Carroll, SDO at 11. The ICA indicated the circuit court's pre-trial discussion with Carroll regarding the possible

prison term for rejecting the State's plea agreement was permissible.  Id.  The ICA ruled the record did not show the circuit court abused its discretion in sentencing Carroll.  Id.

Carroll's application for a writ of certiorari presents the same three issues he had presented to the ICA.

### III.  Standards of Review

**A.     Challenge to juror for cause**

> A trial court's decision on a challenge for cause of a juror is reviewed for an abuse of discretion.  An abuse of discretion occurs when the trial court "exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant."

State v. Iuli, 101 Hawaiʻi 196, 203, 65 P.3d 143, 150 (2003) (citations omitted).

**B.     Motion for judgment of acquittal**

> The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact], a reasonable mind might fairly conclude guilt beyond a reasonable doubt. An appellate court employs the same standard of review.

State v. Keawe, 107 Hawaiʻi 1, 4, 108 P.3d 304, 307 (2005) (alteration in original) (citations omitted).

**C.     Sentencing**

In general, "[t]he applicable standard of review in sentencing matters is whether the court committed a plain and manifest abuse of discretion in its decision."  State v. Putnam,

93 Hawai'i 362, 372, 3 P.3d 1239, 1249 (2000) (citations omitted).

## IV.  Discussion

**A.  The ICA erred in ruling the circuit court did not abuse its discretion in denying Carroll's challenge for cause of Juror 48, and Carroll's right to exercise a peremptory challenge was impaired.**

The first issue raised on certiorari is whether the ICA erred in "holding Carroll's challenges to jurors for cause were not erroneously denied and Carroll's right of peremptory challenges was not violated."[16]  For the reasons discussed below, the first issue regarding the circuit court's failure to dismiss Juror 48 for cause has merit, and it requires that Carroll's conviction be vacated and the case remanded to the circuit court for further proceedings consistent with this opinion.

Carroll contends the circuit court should have granted his challenge to Juror 48 for cause and that he should not have had to use a peremptory challenge to dismiss Juror 48.  The ICA appears to have concluded that based on our existing case law, the circuit court adequately "rehabilitated" Juror 48.  For the following reasons, the ICA erred in concluding the circuit court did not abuse its discretion in denying Carroll's challenge to Juror 48 for cause.

---

[16]    Again, we need not address the challenge to juror number 35.  See supra notes 2 and 8.

26

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial . . . jurors." State v. Graham, 70 Haw. 627, 633, 780 P.2d 1103, 1107 (1989) (alteration in original) (quoting Irvin v. Dowd, 366 U.S. 717, 722 (1961)). "The theory of the law is that a juror who has formed an opinion cannot be impartial." Reynolds v. United States, 98 U.S. 145, 155 (1878). However, a rule "that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality [is] an impossible standard." Graham, 70 Haw at 633, 780 P.2d at 1107 (quoting Irvin, 366 U.S. at 723). "The prevailing rule thus allows a person with preconceived notions about a case to serve as a juror if [they] 'can lay aside [their] impression or opinion and render a verdict based on the evidence presented in court.'" Id. (quoting Irvin, 366 U.S. at 723).

In Graham, the defendant challenged a juror who had made "ambiguous and at times contradictory responses [] to queries regarding her willingness to lay aside impressions or opinions formed from earlier media accounts." 70 Haw. at 634, 780 P.2d at 1108. This court noted that such contradictory responses are not unusual during voir dire examination, "particularly in a highly publicized criminal case." Id. (citation omitted). This court noted the juror's "opinions could hardly be characterized

27

as 'strong and deep impressions which close the mind against the testimony that may be offered in opposition to them.'" 70 Haw. at 634-35, 780 P.2d at 1108 (citation omitted).

In this case, the ICA evaluated Carroll's challenge to Juror 48 based only on standards applicable to jurors who have been exposed to pretrial publicity. However, Juror 48's exposure to the case was not limited to pretrial publicity, unlike the other prospective jurors. Rather, Carroll challenged Juror 48 for cause based on the expressed and strong views of her family members regarding the case.

In Iuli, we addressed a defendant's challenge for cause of a juror whose father and uncles were police officers, and whose brother had just retired as a police chief. 101 Hawai'i at 200, 65 P.3d at 147. We noted that "when a juror is challenged on grounds that he has formed an opinion and cannot be impartial, the test is whether the nature and strength of the opinion are such as in law necessarily raise the presumption of partiality." 101 Hawai'i at 204, 65 P.3d at 204 (internal brackets, quotation marks, and ellipses omitted) (citing Graham, 70 Haw. at 633, 780 P.2d at 1107) (quoting Reynolds, 98 U.S. at 156).

Juror 48's responses and comments indicate the nature and strength of her opinions were "such as in law necessarily raise the presumption of partiality." Juror 48's daughter and son-in-law worked at a Hawaiian immersion school, which her three

grandchildren attended.  She had "another child who's a Hawaiian activist."  She indicated she had heard comments made by family members because her "children are very involved in Hawaiian activities and the statue is important to them."  Juror 48 also explained that her children were very upset that the statue was "desecrated" and stated that "[s]omething should be done" as a result.

Then, after the circuit court's statement that "[not] too many people would disagree with those sentiments," in response to the circuit court's inquiry as to whether Juror 48 could "set that aside" and "presume [Carroll] innocent until he is proven guilty beyond a reasonable doubt," Juror 48 stated that although she "would certainly do her best," it was the opinion of her "husband and others" that "if it does get to court there's a lot of -- got to be a lot of proof somewhere."  When the circuit court again asked if Juror 48 could presume Carroll's innocence, Juror 48 suggested she could not, responding that she understood she was saying she presumed Carroll guilty until he could prove his innocence.

Juror 48's responses and comments clearly raised the presumption of partiality, which was compounded by her statements asserting that Carroll needed to present "pretty good evidence" to prove his innocence.  Thus, Juror 48 expressed serious doubts about her ability to be fair and impartial.

In Iuli, we indicated that if a prospective juror expresses serious doubts about their ability to be fair and impartial, they must be excused for cause, unless they ultimately assure the trial court that they will base their decision solely upon the evidence.  101 Hawai'i at 205, 65 P.3d at 152 (citing State v. Ibanez, 31 P.3d 830, 832 (Ariz. Ct. App. 2001)).  After serious doubts were raised about Juror 48's ability to be fair and impartial, the circuit court engaged in lengthy explanations of the need for jurors to set aside biases, that verdicts have to be based on the evidence presented in court, and of the need to set aside information she had gotten from newspapers or her family.  Juror 48 only gave mono-syllabic "yes" responses to each of the circuit court's lengthy explanations.  When the circuit court then asked for her to give a percentage of her "degree of certainty or confidence" as to her ability to "do these things,"[17] Juror 48 indicated "90 percent" confidence. Yet, regarding the "90 percent," in response to further voir dire questioning by defense counsel, Juror 48 stated she has "a lot of faith in the police," and that she would "feel that if there was proof it's got to be somewhat sustainable or why would it be proved?"

---

[17]     It is unclear whether "these things" referred only to the need to set aside information Juror 48 received from newspapers or her family, or also to the other topics within the circuit court's lengthy explanations that drew her "yes" responses.

As held in <u>Griffin v. Commonwealth</u>, 454 S.E.2d 363 (Va. Ct. App. 1995), a trial judge may not rehabilitate an obviously biased juror by long, complex, and leading questions, and a conviction in which such a juror participates must be set aside due to manifest error. Also, trial and appellate courts "are not bound by a prospective juror's statement that [they] will be fair and impartial." <u>State v. Kauhi</u>, 86 Hawai'i 195, 199, 948 P.2d 1036, 1040 (1997). "Common sense and human experience tell us that anyone in [Juror 48's] position," with children who were deeply affected and upset by the crime of which Carrol was accused, "would be reluctant to return a verdict [of acquittal], no matter how great her belief that she could set aside her personal feelings." <u>Walls v. Kim</u>, 549 S.E.2d 797, 800 (Ga. Ct. App. 2002).

In its attempt to rehabilitate Juror 48, the circuit court asked numerous leading questions. Mere assent to leading inquiries "is not enough to rehabilitate a prospective juror who has initially demonstrated a prejudice or partial predisposition." <u>Griffin</u>, 454 S.E.2d at 366 (citation omitted). Leading questions employed to rehabilitate a prospective juror after an unequivocal demonstration of bias are generally insufficient, as leading questions, particularly from the court, may often lead to unreliable answers. This is because "[w]hen asked by the court, a suggestive question [may produce] an even

more unreliable response," because of "[a] juror's desire to 'say the right thing' or to please the authoritative figure of the judge." McGill v. Commonwealth, 391 S.E.2d 597, 600 (Va. Ct. App. 1990). Thus, in general, a juror should, in their own words, clarify or modify a declaration of bias in a fashion which demonstrates that any bias can be set aside. See Scott v. Commonwealth, 708 S.E.2d 440 (Va. Ct. App. 2011).[18]

Juror 48's "presumption of partiality" was therefore not ultimately rectified based on her "yes" responses to the many leading questions asked by the circuit court. Juror 48 did not, in her own words, clarify or modify her earlier indicated bias in a fashion demonstrating that her bias could be set aside.

Finally,

> [a] trial judge should err on the side of caution by dismissing, rather than trying to rehabilitate, biased jurors because, in reality, the judge is the only person in a courtroom whose . . . primary duty . . . is to ensure the selection of a fair and impartial jury.

Walls, 549 S.E.2d at 799. In this case, rather than err on the side of caution, the circuit court engaged in extensive explanations in an attempt to rehabilitate Juror 48. "The trial judge, in seeking to balance the parties' competing interests,

---

[18] We recognize that it may be necessary for the trial court, during voir dire, to explain concepts such as the presumption of innocence to prospective jurors, who are often unfamiliar with legal processes and terms, and confirm that prospective jurors understand what those concepts mean. Nothing in this opinion should be read to foreclose that practice. We only caution that attempting to rehabilitate a juror who has expressed doubts about the ability to be fair and impartial is best conducted via open-ended questions that allow a juror to show in their own words that they can remain impartial, and in this case, Juror 48 did not show that she could do so.

must [, however,] be guided not only by the need for an impartial jury, but also by the principle that no party to any case has a right to have any particular person on their jury." Id. (footnote omitted).

In this case, the circuit court abused its discretion by denying Carroll's challenge for cause of Juror 48. As Carroll exhausted his peremptory challenges, the circuit court's failure to excuse Juror 48 precluded Carroll from exercising one of his peremptory challenges on a different prospective juror. Carroll's right to exercise his peremptory challenge was therefore "denied or impaired," and his conviction must be vacated. This case is therefore remanded to the circuit court for further proceedings consistent with this opinion. See Kauhi, 86 Hawaiʻi at 200, 948 P.2d at 1041.

**B. The ICA did not err in concluding the evidence, when taken in the light most favorable to the State, was sufficient to support a prima facie case, i.e., the value of the stolen or damaged property.**

The second issue raised on certiorari is whether the ICA erred in holding the circuit court did not erroneously deny Carroll's motion for judgment of acquittal. Although the conviction must be vacated due to the circuit court's abuse of discretion in denying Carroll's challenge for cause of Juror 48, we must also address the second issue, as the motion for judgment of acquittal was based on sufficiency of evidence and

the defense did not present any evidence after the motion for judgment of acquittal made at the close of the State's case. State v. Calaycay, 145 Hawai'i 186, 195 n.8, 449 P.3d 1184, 1193 n.8 (2019). The prohibition against double jeopardy therefore requires this court to address Carroll's insufficiency of evidence claim. State v. Davis, 133 Hawai'i 102, 120, 324 P.3d 912, 930 (2014).

Carroll argues the evidence was insufficient to prove the necessary valuation thresholds of the various charges (more than $300 for theft in the second degree of the spear in Count 1, more than $1,500 for criminal property damage in the second degree in Count 2 as to the statue, and more than $100.00 for theft in the third degree in Count 3 for the chain and pole). Carroll points out that the only evidence presented at trial as to the value or repair cost of the spear, and the repair costs of the statue, was testimony provided by the KSAA officer. Carroll asserts the KSAA officer had no background in art or sculpture, had not worked as a general contractor since 2000, and had "guessed" at what material costs would be necessary to repair damaged portions of the statue. Additionally, Carroll contends the purchase price of the chain and pole in 2010 or 2011 is insufficient to support a finding as to their 2015 value.

Carroll's arguments lack merit.  Viewing the evidence in the light most favorable to the State, there is substantial evidence to support the convictions on all three counts.[19]

For purposes of all three charges, HRS § 708-801 provides that "value means the market value of the property or services at the time and place of the offense, or the replacement cost if the market value of the property or services cannot be determined."  HRS § 708-801(1).

With respect to Count 1, regarding theft of the spear from the KSAA "of property the value of which exceeds $300," the KSAA officer testified the value of the taken portion of the spear was $2,500.  With respect to Count 2, damages to the statue exceeding $1,500, the KSAA officer testified the repair cost was $3,500.  With respect to Count 3, regarding theft of the chain and pole from Bayfront Motors "of property the value of which exceeds $100," the manager of Bayfront Motors, testified the purchase price of the chain and pole in 2010 or 2011 was roughly $135.

This evidence, as further described in Section II.B.4 above, when viewed in the light most favorable to the State, constitutes sufficient evidence for all counts.

---

[19]     Although Counts 1 and 2 were merged for sentencing, we must address both counts in the event there was insufficient evidence for one.  See supra note 11.

## C.    **We need not address the sentencing issue.**

Based on our rulings on the first two questions on certiorari, we need not address Carroll's third question, whether the ICA erred in holding the circuit court's sentence did not improperly penalize or punish Carroll for exercising his right to trial.[20]

### V.    Conclusion

For the reasons stated above, we vacate the ICA's November 27, 2018 judgment on appeal and the circuit court's July 26, 2016 judgment of conviction and sentence, and we remand this

---

[20]    We note that in Kamana'o, we held that "a sentencing court may not impose an enhanced sentence based on a defendant's refusal to admit guilty with respect to an offense the conviction of which he intends to appeal." 103 Hawai'i at 316, 82 P.3d at 402.

We also note that, after the sentencing in this case, in State v. Sanney, 141 Hawai'i 14, 404 P.3d 280 (2017), we indicated:

> First, absent unusual circumstances, a trial court should not provide a sentencing inclination unless plea negotiations have concluded or did not occur. Second, before giving a sentencing inclination, a trial court should consider whether the existing record concerning the defendant and the defendant's offenses is adequate to make a reasoned and informed judgment as to the appropriate penalty. Third, a trial court must follow the established principle forbidding a trial court from improperly considering the defendant's exercise of his constitutional right to a trial as an influential factor in determining the appropriate sentence. State v. Kamanao, 103 Hawai'i 315, 321 n.8, 82 P.3d 401, 407 n.8 (2003) (citations omitted). In other words, the sentencing inclination must be the same punishment the court would be prepared to impose if the defendant were convicted after trial.

141 Hawai'i at 21, 404 P.3d at 287 (internal parentheses, ellipsis, and quotation marks omitted).

case to the circuit court for further proceedings consistent

with this opinion.

Keith S. Shigetomi,                   /s/ Mark E. Recktenwald
for petitioner
                                      /s/ Paula A. Nakayama

Ha'aheo M. Kaho'ohalahala,
for respondent                        /s/ Sabrina S. McKenna

                                      /s/ Richard W. Pollack

                                      /s/ Michael D. Wilson